251 N.J. Super. 169 (1991)
597 A.2d 571
IRMA FAGAS, PLAINTIFF,
v.
PETER J. SCOTT, DEFENDANT-COUNTERCLAIMANT THIRD PARTY PLAINTIFF,
v.
BENE NEW HOPE, INC., THIRD PARTY DEFENDANT.
Superior Court of New Jersey, Law Division Essex County.
Decided June 11, 1991.
*176 Margaret Dee Hellring for plaintiff (Hellring, Lindeman, Goldstein & Siegal, attorneys; Jonathan L. Goldstein of counsel).
Morris M. Schnitzer for defendant.
VILLANUEVA, J.S.C.
After plaintiff instituted a complaint solely to eject defendant from her home, defendant filed an answer, a ten-count counterclaim and a third-party complaint. Plaintiff prevailed on all issues[1] at the trial and now seeks to be reimbursed for her legal fees and litigation expenses under N.J.S.A. 2A:15-59.1, the so-called frivolous litigation statute (the "act"). Defendant denies that plaintiff is entitled to recovery under the act and contends that the act is unconstitutional because it violates the Supreme Court's exclusive rule-making power over procedure under the New Jersey Constitution. Defendant also contends that the act is void for vagueness and violates due process.
The Court holds that plaintiff is entitled to recover her reasonable attorneys fees and litigation costs under the act, which is constitutional.

*177 Procedural History and Preliminary Statement.

Plaintiff Irma Fagas and defendant Peter J. Scott lived together in Fagas' solely-owned home in a non-marital, fully informed, intimate social relationship. For almost five years plaintiff permitted defendant to live with her in her home, which she supported almost exclusively. Defendant voluntarily paid for substantial improvements to the home and paid considerably less of the expenses than plaintiff paid. When the relationship ended in September 1989, plaintiff asked defendant to leave her home, but he refused to do so.
In order to eject defendant from her home plaintiff was required to apply to the court. On November 16, 1989, plaintiff, upon notice to defendant, applied for an order to show cause with temporary restraints. The sole relief she sought was to eject defendant immediately from her home. Plaintiff sought no money, no property and no airing of the parties' problems and affairs.
When defendant received plaintiff's complaint and demand for ejectment, he filed defenses and counterclaims to prevent his removal from her home.
On the presentation of her proposed order to show cause plaintiff showed that she was the sole owner of her house, she had a probability of success on the merits, she would suffer immediate and irreparable harm unless defendant was removed from her home and defendant, a man of enormous wealth[2] who had the financial ability to relocate from plaintiff's home at any moment, would suffer no hardship if ordered to vacate. Despite the above showings, the judge refused to grant plaintiff's application for interim relief on the sole ground that he did not have the authority to make a ruling of ejectment, pendente lite, *178 in an emergent application and in the absence of a plenary hearing.
Plaintiff, believing that she was entitled to an order of ejectment immediately, sought leave to appeal to obtain accelerated relief pursuant to R. 2:9-8. The matter was heard on an emergent basis by the Appellate Division, which granted leave to appeal and held that the trial court did have authority to make an emergent ruling for ejectment. The trial court was ordered to hold a hearing to determine whether a preliminary injunction should be issued to eject defendant from plaintiff's home. On December 6, 1989, the matter was heard by a Law Division judge, but he refused to grant relief to plaintiff.
In the first count of his counterclaim defendant-counterclaimant alleges that plaintiff agreed with him to jointly purchase 495 Longview Road, South Orange, where they would cohabit. He alleges a joint-expense agreement by which he incurred numerous expenses including paying for improvements to the home. He seeks a one-half interest in the home and an accounting and reimbursement for half of the joint expenses during their relationship.
The second count alleges estoppel and seeks specific performance of the alleged agreement to be a one-half owner of plaintiff's house.
The third count alleges fraud and seeks to have a constructive trust imposed on the house.
The fourth count is for unjust enrichment and quasi-contract.
The fifth count seeks a partition of the property.
Four counts were for notes totalling $105,376.25 executed by Bene New Hope, Inc., plaintiff's corporation, which were not signed individually by plaintiff nor endorsed by her.
*179 The third-party complaint against plaintiff's corporation dealt solely with these notes. Defendant obtained partial summary judgment against the corporation for the principal with the determination of interest, if any, to await a final hearing.
Plaintiff was compelled to amend her complaint to respond affirmatively to meet defendant's allegations. R. 4:7-1. Plaintiff claims that if there were a joint-expense agreement, she is entitled to: reimbursement (not defendant, as he claimed in his accountings); quantum merit and/or unjust enrichment to meet defendant's similar claim; the value of securities wrongfully withheld by defendant; funds from a jointly-held corporation, Salbin & Sachsel, claimed by defendant; and the fair market rental value of the space defendant occupied in plaintiff's house against her will.
At the 12-day trial, the court found that defendant had malicious motives, was unfair, desired to destroy plaintiff, stole from plaintiff, and had a plan to get from the court system, which he knew that he was improperly burdening, what he had not been able to get from plaintiff by contract. The court found that defendant never believed that he owned one-half of the home, defendant's statements that there was an agreement to share or reimburse expenses were false, defendant purposely harassed and humiliated plaintiff during the litigation and he kept the litigation going for the purpose of remaining in rent-free premises.
The court evicted defendant from plaintiff's home, ruled in plaintiff's favor on all other claims and awarded her damages of $42,640.75 ($8,533.75 for rent and $34,107 for the stock dividend reinvestment program), plus interest. The court awarded defendant $4,948.98 interest against Bene New Hope, Inc. on the third-party complaint. The court reserved decision on plaintiff's application for relief under the act. Plaintiff claims that defendant's defense of her action for ejection was frivolous, was continued in bad faith and was asserted solely *180 for the purpose of harassment, delay and malicious injury and that all other defenses and counterclaims were frivolous.
Although defendant gave the Attorney General notice of his motion to declare the act unconstitutional, pursuant to R. 4:28-4, the Attorney General declined to intervene at this stage.

Defendant-Counterclaimant's Contentions.
In response to plaintiff's motion for reimbursement of legal fees and litigation expenses, defendant-counterclaimant raises the following issues: (1) in the exercise of sound discretion, the court should deny any award under the act; (2) none of his claims or defenses were legally or equitably insufficient; (3) the case was litigated by him in good faith believing that the facts and law were as set forth by his attorney in the trial brief and proposed findings of fact and conclusions of law; (4) since plaintiff was not the prevailing party, she does not qualify for counsel fees under the act; (5) plaintiff's affidavit of services is not sufficiently detailed to allow an allocation; (6) plaintiff can recover only for those services which were reasonably necessary because of frivolous claims or defenses and only for a period after defendant's appearance in court; (7) the attorneys' fees sought are not reasonable; (8) counsel fees must be reasonably proportionate to the matters involved; (9) court-awarded counsel fees may not exceed the amount agreed upon between claimant and her attorney; (10) attorneys' fees incurred in preparing motion for attorneys' fees and litigating the propriety and quantum of the fees are not recoverable; (11) "reasonable litigation costs" are limited to transcript expenses and statutory witness and filing fees; and (12) the act is unconstitutional because it: (a) infringes upon the Supreme Court's constitutionally exclusive power to define and regulate the standards for reasonable legal fees; (b) denies due process of law under both the United States and New Jersey Constitutions because counsel fees are awarded on grounds never pleaded, confronted or tried; and (c) is void for vagueness.

*181 I.

Plaintiff is Entitled to Recover Reasonable Attorneys' Fees and Litigation Costs Pursuant to N.J.S.A. 2A:15-59.1.

A.

The Act.
The act, N.J.S.A. 2A:59-1[3] provides:
a. A party who prevails in a civil action, either as a plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.
b. In order to find that a complaint counterclaim, cross-claim or defense of the nonprevailing party was frivolous, the judge shall find on the basis of the pleadings, discovery, or the evidence presented that either:
(1) The complaint, counterclaim, cross-claim or defense was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or
(2) The nonprevailing party knew, or should have known, that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.
c. A party seeking an award under this section shall make application to the court which heard the matter. The application shall be supported by an affidavit stating in detail:
(1) The nature of the services rendered, the responsibility assumed, the results obtained, the amount of time spent by the attorney, any particular novelty or difficulty, the time spent and services rendered by secretaries and staff, other factors pertinent in the evaluation of the services rendered, the amount of the allowance applied for, an itemization of the disbursements for which reimbursement is sought, and any other factors relevant in evaluating fees and costs; and
(2) How much has been paid to the attorney and what provision, if any, has been made for the payment of these fees in the future.
There is nothing to suggest that an award of fees under the act should be made in all but exceptional cases, as was the intent of Congress in enacting 42 U.S.C.A. § 1988. See Teitelbaum v. Sorenson, 648 F.2d 1248, 1251 (9 Cir.1981). Gregg v. Township Committee of the Township of Hazlet, 232 N.J. Super. *182 34, 37, 556 A.2d 348 (App.Div. 1989); Zarcone v. Perry, 581 F.2d 1039, 1041-1042 (2 Cir.1978), cert. den. 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979).
On the other hand, in Iannone v. McHale, 245 N.J. Super. 17, 583 A.2d 770 (App.Div. 1990) the Appellate Division stated:
We thus construe N.J.S.A. 2A:15-59.1 in view of the concern that while baseless litigation must be deterred, nevertheless the counsel-fee sanction mode of deterrence should not be permitted to generate even more litigation, the right of access to the courts should not be unduly infringed upon, honest and creative advocacy should not be discouraged and the salutary policy of litigants bearing, in the main, their own litigation costs, should not be abandoned. Hence the counsel-fee sanction must not be made available for every litigation infraction. [Id. at 28, 538 A.2d 770].

B.

Purpose of the Act.
In Chernin v. Mardan Corp., 244 N.J. Super. 379, 582 A.2d 847 (Ch.Div. 1990), the court stated:
The design of the statute is to discourage the advancement of frivolous positions through the imposition of attorney's fees upon the nonprevailing party. Evans v. Prudential Property & Cas. Ins. Co., 233 N.J. Super. 652, 657-659, 559 A.2d 888 (Law Div. 1989). The statute should "deter and ultimately eliminate the filing of nonmeritorious claims and defenses." Somerset Trust Co. v. Sternberg, 238 N.J. Super. 279, 285, 569 A.2d 849 (Ch.Div. 1989). [Id. 244 N.J. Super. at 382, 582 A.2d 847].
The Appellate Division in addressing N.J.S.A. 2A:15-59.1 emphasized that a finding of frivolousness must be based on the record already made in the matter.[4] Factual assertions ("collateral evidential forays into states of mind and non-record facts and circumstances") are not to be considered. Iannone v. McHale, supra, 245 N.J. Super. at 29, 583 A.2d 770. Since the court must consider the evidence presented before it, all the papers submitted and the parties' credibility already judged, this is easy. The court delivered a lengthy decision with detailed findings of fact, many of which bear directly on the frivolousness of defendant's defenses and counterclaims, *183 whether defendant acted in bad faith, whether defendant intended to harass, delay or cause malicious injury, and, finally, whether defendant, in the court's opinion, knew or should have known, that his defenses and counterclaims were without reasonable basis in fact, law or equity.

C.

Factual Findings.
Despite defendant's contention that his actions do not warrant an award, this court believes that his oppressive, egregious conduct, particularly daily harassment of plaintiff for more than one year by continuing to live in her house, mandate an award. If the facts herein do not justify recovery of plaintiff's attorneys fees and litigation costs, there could never be an award made under the act.
This court has noted plaintiff's substantial suffering at the hands of defendant. While all plaintiff desired was an end to her relationship with defendant and his departure from her home, she was required to suffer painful, lengthy and costly litigation, which she could not afford emotionally or financially. On the other hand, defendant could well afford the enormous legal fees. Continuation of this litigation was solely within his control, as he pressed the fabricated and frivolous claims. Plaintiff initiated her action against defendant only to have him evicted from her home. If defendant in good faith thought that he had bona fide claims, he could have moved out and then instituted legal action for them.
The irony of this case is that because defendant in bad faith refused to leave plaintiff's house and continued to harass plaintiff by his daily presence in her house and by engaging in costly litigation, she is now forced to leave her house  if she can sell it. It would have been easier for plaintiff to have had defendant removed from her house by the court if they had been married. Plaintiff had rejected defendant's requests to marry him, both before and after plaintiff purchased her home *184 in 1984. Defendant's first motion made on December 1, 1989 was to transfer this matter from the Law Division to the Chancery Division, Family Part, which, of course, was denied. Such a motion had no basis in fact, reality, law or equity.
This court is not "constrained", as the Appellate Division was in Iannone v. McHale, supra, with quashing "important litigation going to the heart of the democratic process upon which all our institutions depend." 245 N.J. Super. at 32, 583 A.2d 770. The court herein is not faced with election contests litigation or with the rights of United States citizens to democratic processes; rather this is a private litigation in which an ungrateful gigolo wrongfully and maliciously abused, not only his prey, but also the court system in an attempt without any reasonable basis to show he was in the right, and continued to take advantage of an already tormented victim.
The court, in its oral decision transcribed onto 151 pages, cited continued instances of bad faith, intent to harass, desire for delay and purposeful malicious injury by defendant.
The court described the bad faith:
[Peter Scott] was ... an ingrate. He was unloving... He was devious. He was conniving. He was two-faced. He was selfish. He was lonely; he was untrustworthy; he was a thief having taken valuable papers of the plaintiff....
Here he was worth millions and attempting to take advantage of Mrs. Fagas. There are so many examples I'm not going to mention them all, but there are literally dozens ... Probably the most horrendous, unbelievable instance of someone being cheap, chintzy, unfair, was with reference to the Club Med situation, where over $6,000.00 was paid to take Mrs. Fagas' mother and one of her children and Mr. Scott for a nice party on her 55th birthday. Actually, that should have been paid for by Mr. Scott, instead it wasn't paid by Mr. Scott. Instead he generously gave her two silk undershirts worth something like $42.00 as his "loving" birthday party to her, and then he comes into Court with his accounting and he wants to charge her $140.00, $142.00, some amount for some dinner that they had during this vacation period. That's not strange. That's crazy. That's weird. That's not anything that a gentleman, a reasonable businessman would do, or a loving partner would do. That type of action the Court cannot understand. Not only that; probably a couple of hundred in this particular proceedings.

*185 ....
The Court finds beyond a reasonable doubt, although that's not the standard, that at no time, [were] Mrs. Fagas' dealings with Mr. Scott, ever motivated by the desire to derive or obtain anything financial from him. Yet on the other hand, it appears that almost all of Mr. Scott's actions were so designed.
....
... he has flip-flopped in his claim. He's made inconsistent claims. He's made claims as to each and every item. He's manufactured things.
....
... The Court finds that the testimony of Mr. Scott that he considered himself to be purchasing an ownership share in Mrs. Fagas' home by paying for furnishings or decoration, which payment he alone urged and pressed, is not credible, is not true. In fact, the Court finds it's a fantasy or a fabrication. Take your pick.
....
The Court finds that Mr. Scott never at any time prior to the beginning of this litigation, ever made any claim to the Plaintiff that he had an ownership in the house, or that he was entitled to money under a joint expense agreement. And that his testimony  that is Mr. Scott  that he believed all along that there was an unspoken agreement giving him ownership  is not only incredible, it's false.
In September 1989, plaintiff asked defendant to leave her home. Although he knew that he had no interest in the home or right to remain in her home or in her life, solely through this litigation he was able to delay leaving this comfortable, "price-is-right" (as defendant stated to witness Peter Polow) home.
The court also found that the injury defendant imposed on plaintiff was malicious, "what he did ... to the Plaintiff, Mrs. Fagas, is inexcusable to ruin her life for the last [year], and more particularly probably for the rest of her life." Defendant knew what he was doing and did it purposely. The court found:
What's happened to her as I can observe has probably had greater affect on her state of mind than either the divorce she went through or the death of a husband. All of which Mr. Scott can be thankful for, or happy for, or be proud of. That he has been able to destroy a person who gave him so much happiness.
*186 Finally, this court found that defendant knew or should have known that his counterclaims and his defenses were without any reasonable basis in law or equity. The court found that defendant knew that he did not have an ownership interest in plaintiff's home and that all through their relationship he was constantly trying to figure out a way, which he knew he never achieved, to acquire a one-half interest in her home.
One of defendant's theories for claiming a one-half interest in the house was his idea of avoiding the tax consequences to plaintiff of selling her Redmond Road house if defendant were permitted to acquire a present interest in the acquisition of the Longview Road house. Defendant's request was flatly rejected by plaintiff and her attorney. Nonetheless, defendant granted plaintiff a purchase money mortgage loan at bank rates for one-half of the purchase price of $425,000, even though plaintiff had already arranged for such a mortgage from her bank. Then, shortly after the closing, defendant demanded the return of his money, almost two years before the mortgage and note were due. This court stated that it:
... still does not know why or understand why Mr. Scott summarily called the mortgage and note which we, I'm sorry  were not due [for] another 22 months. This precipitous callous demand would constitute a breach of any and all agreements claimed by Mr. Scott.
The court found that all of defendant's claims were false and that he knew at the time he filed his defenses and counterclaims that no such agreements existed:
Mr. Scott never at any time prior to the beginning of this litigation, ever made any claim to the Plaintiff that he had an ownership in the house, or that he was entitled to money under a joint expense agreement. And that his testimony  that is Mr. Scott  that he believed all along that there was unspoken agreement giving him ownership  is not only incredible, it's false.
The court found that when plaintiff asked defendant to leave her home before she instituted this litigation, he knew that he did not own any share of the home:
But, when Mrs. Fagas asked Mr. Scott to leave his first reaction was to say he loved the house and he'd like to purchase it from her, and Mr. Scott and Mrs. Fagas discussed the last purchase price, or proposed asking price for the house, which was $885,000.00. And the Defendant, Mr. Scott, begged Mrs. Fagas to please give him some time in order to try to put together an offer to purchase *187 the house from her as close to this price as possible, and at no time ever after Mr. Scott had been asked to leave did Mr. Scott ever say to Mrs. Fagas that he believed he already owned any portion of this home on Longview.
Defendant claimed that an agreement existed between the parties to share expenses, to reimburse each other for expenses, to keep an accounting of expenses and to account and even out such expenses. The court found that defendant knew no such agreement ever existed:
Now there have been allegations of a joint expense agreement. The Court finds there was never any joint expense agreement, as is manifested by the fact that was never discussed or agreed with Mrs. Fagas. Not only that, no money or no statement was ever rendered to Mrs. Fagas until after this litigation began, and not only that, there was not a proper accounting because Mr. Scott never made any bona fide attempt to find all the expenses which were paid for, nor did he credit all the expenses which were paid by Mrs. Fagas.
The court found that defendant, who had always kept in his computer "compulsively detailed records of expenditures divided into these various codes," made a claim that an agreement existed between the parties to defeat plaintiff's ejectment action with false claims and to assert false counterclaims against her.
This court found that defendant's claim for a portion of the installment payments being paid to plaintiff for the sale of the Irma's Bag Livingston and Salbin & Sachsel businesses had no factual basis:
In addition, it's uncontroverted that from April 1987 until the assertion by the Defendant of his Counterclaim against the Plaintiff in this litigation, December 1989, a period of two years and eight months, the Defendant knew Plaintiff was receiving these installments, and made no objection or statement with reference thereto. And he never indicated in any fashion he felt he was entitled to receive any portion of this. Plaintiff had not concealed any facts to the Defendant, and he in fact negotiated the agreement, and the testimony clearly shows that the parties knew and agreed that all these payments were due and to be payable to, and to be held by and for Mrs. Fagas and that is [uncontroverted].
Plaintiff did not seek to humiliate or dishonor defendant. Plaintiff sought merely to live peacefully in her own home, free from insults, dishonor and freeloading. Defendant's defense to plaintiff's simple request for him to leave her home and defendant's oppressive and malicious counterclaims were asserted in bad faith, to further harass and take advantage of plaintiff, to *188 delay what defendant knew would be his eventual eviction from plaintiff's home, to obtain revenge on plaintiff, and "to destroy a person who gave [defendant] so much happiness. Probably more so than anybody in his life, including his children from what [the court has] gathered in this proceeding."
Defendant is an educated and sophisticated businessman. He was experienced in dealing with lawyers, with courts, and with litigation. The court found him to have a "brilliant" mind, but "devious," "conniving," "untrustworthy," "vengeful," "psychotic," "a pathological liar," "a criminal," and "ungrateful."
Defendant knew or should have known prior to filing his answer and counterclaim that they were false and without any reasonable legal or equitable basis. He did not need discovery to determine the truth. He knew that he was causing enormous legal fees to himself and plaintiff (he knew precisely the extent of plaintiff's finances and could therefore use this against her[5]) and knew and understood that he was clogging the court system with this litigation[6], which he acknowledged during trial.

II.

Interpretation of the act.

A.

The statute should be interpreted as stated. It applies to actions filed with malicious intent and with lack of factual support as well as actions filed which are insufficient in law.
Defendant relies upon his trial brief and proposed findings of fact and conclusions of law to establish that it "represents a *189 bona fide belief in the validity of both the legal arguments and their soundness as well as in the factual version they distilled from the record of the evidence." However, much of it was predicated on fabricated facts and is therefore frivolous.
Defendant contends that, both in text and context, the term "frivolous," as applied to the merits and as distinguished from motives, is confined to legal insufficiency.
Under the former practice "frivolous" meant legal insufficiency, and "sham" described factual insufficiency. See Chief Justice Brogan's opinion in National Surety Corporation v. Clement, 133 N.J.L. 22, 42 A.2d 387 (E. & A. 1945), where the dichotomy between the two terms was expounded.
Defendant's contention that this court's findings merely treated his positions as factually unsubstantiated, i.e., as "sham" is erroneous. Defendant further contends that, by a parity of reasoning, counsel fees in the instant case must be denied unless, on the facts as pleaded, and supported by evidence, defendant's claims and defenses were legally insufficient, i.e., "without any reasonable basis in law or equity...."
Defendant's claims and defenses were "frivolous," i.e., fabricated to fit an otherwise proper cause of action.
"A claim or defense is frivolous or groundless where no rational argument can be advanced in its support, or it is not supported by any credible evidence, or a reasonable person could not have expected its success, or it is completely untenable." 20 C.J.S., Costs, § 128 at 109.
Defendant asks this court to ignore the clear wording and intent of the act. Section (b) of the act provides that a court may find a violation if it finds either that:
(1) the complaint, counterclaim, cross-claim, or defense was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or
(2) the non-prevailing party knew, or should have known that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or *190 equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.
Therefore, the court finds that attorneys fees should be awarded because the defenses and counterclaim were commenced, used and continued in bad faith: (1) solely for the purpose of harassment; and (2) for the purpose of delaying his removal from the rent-free house; and (3) to inflict malicious injury on the plaintiff.
Defendant seeks to exempt from the act's penalties, persons who file pleadings with an intent to injure another party and persons who file pleadings knowing that the allegations contained in the pleadings are false. He maintains that even if he made allegations which he knew or should have known were false and/or made allegations for the sole purpose of injuring plaintiff, he is not subject to the act if his allegations, assuming they were true, set forth a valid cause of action. In other words, according to defendant, one can avoid liability under the act if he sets forth a definable cause of action in his pleading, regardless of the truth or falsity of the allegations contained in the pleading or the motives underlying the filing of the pleading. Defendant's position is frivolous, unfounded and is rejected.
Courts which have interpreted the act clearly indicate either "prong" of the statute may serve as the basis for the imposition of sanctions, and that a pleading containing knowingly false allegations is a pleading "without any reasonable basis in law or equity."
In Evans v. Prudential, 233 N.J. Super. 652, 559 A.2d 888 (Law Div. 1982), the court held that filing a pleading solely to injure another is a sufficient basis to impose sanctions. Distinguishing the statutory offense from the tort of malicious prosecution, the court stated:
... while under the statutory claim, either malevolence or lack of legal or equitable justification in taking a position is required, in a malicious prosecution cause of action malicious motive and lack of probable cause are each needed. [Id. at 661, 559 A.2d 888; emphasis supplied]
*191 In Sjorgren, Inc. v. Caterina Ins., 244 N.J. Super. 369, 582 A.2d 841 (Ch.Div. 1990), the court found that a plaintiff who had filed a lawsuit containing knowingly false allegations in order to coerce a tenant to vacate his leasehold violated both "prongs" of the statute, and the complaint was "without legal basis in law or equity." The court stated:

N.J.S.A. 2A:15-59.1(b) clearly states that a court may find a complaint to be frivolous where the non-prevailing party knew, or should have known that the complaint ... was without reasonable basis in law or equity.... Without a doubt the plaintiff knew or should have known from the above facts that its complaint was without a reasonable legal or equitable basis." [Id. at 376, 582 A.2d 841]
The court also found that, as the complaint was filed to wrongfully deprive the tenant of his property, it could be found "to have been brought or continued in bad faith solely for the purpose of harassment, delay or malicious injury." Ibid.
The decision of the Appellate Division in Iannone v. McHale, supra, does not support defendant's restrictive interpretation of the statute. While the court cites Fed.R.Civ.P. 11 which "prescribes a conjunctive two-prong test for sanctionable baselessness, improper motive and a litigation position founded in fact and law," the court makes it clear that the act contains a "disjunctive, two-prong test," 245 N.J. Super. at 29, 583 A.2d 770, and also refers to "improper motive or legal unfoundedness." Id. at 32, 583 A.2d 770.
Interpreting the act, as defendant suggests, to exempt from its penalties persons who file pleadings which state an otherwise viable cause of action which they know to be false or solely for the purpose of harassing another, would subvert the purpose of the act which, as noted in Iannone, is to deter "baseless litigation." Id. at 28, 583 A.2d 770.

B.

Plaintiff is the prevailing party in this litigation as she prevailed on all issues.
Defendant incorrectly states that plaintiff cannot be considered "the prevailing party" because judgment was rendered *192 against plaintiff as to liability on the notes to defendant from Bene New Hope, Inc.
Plaintiff was not found liable on the notes from Bene New Hope. Liability was found only against third-party defendant Bene New Hope, Inc.
Moreover, the fact that plaintiff returned to defendant, which she offered to do from the outset, the furniture which he purchased, certainly does not mean that plaintiff was not "the prevailing party" in the litigation. Defendant sought one-half of the purchase price of the furniture, not one-half of its present value. Even where a settlement is reached, the facts can be interpreted to demonstrate that one party has "prevailed" for purposes of the act. Chernin v. Mardan Corp., supra, 244 N.J. Super. at 383, 582 A.2d 847. Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).
Defendant asserts that he prevailed as to the stock dividend reinvestment program as he "provided the evidence and supporting schedules establishing the amount due." Again, this is untrue. The court accepted defendant's figures as to the amount due plaintiff[7] which she had learned during discovery but later were denied by defendant at trial.

C.

Plaintiff is not entitled to recover for services performed regarding the Bene New Hope, Inc. notes.
Plaintiff's counsel's affidavit of services specifically separates and details the services performed for plaintiff individually and those for third-party defendant Bene New Hope, Inc. While plaintiff contends that both she and third-party defendant *193 Bene New Hope, Inc. are entitled to recover their counsel fees and costs, this court finds that, although plaintiff was not found liable, she is not entitled to recover legal fees with regard to the notes because defendant prevailed against the corporation on the third-party complaint.

D.

The counsel fees sought are reasonably proportionate to the amount involved.
There is a principle of proportionality between the amount involved, the results obtained and the counsel fees allowable by a court. See R.P.C. 1.5(a)(4). Helton v. Prudential Property & Cas. Ins. Co., 205 N.J. Super. 196, 200, 500 A.2d 717 (App.Div. 1985).
Although there is no requirement that an award of attorneys' fees be proportionate to damages, "the amount of damages that a plaintiff recovers is relevant to the amount of attorney's fees to be awarded." Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 616, 581 A.2d 91 (App.Div. 1990).
This court denied defendant's claim to a one-half interest in plaintiff's home, for which she paid $425,000 six years ago, and ruled in her favor on all other issues. The dollar dimension of plaintiff's application for approximately $200,000 in legal fees, compared to defendant's claims, is not disproportionate to what was at stake.
In response to plaintiff's notice of demand for damages, pursuant to R. 4:5-2, defendant claimed $750,000. Continuing the harassment, he later sought over one million dollars on his counterclaim. It was primarily his claims which necessitated 18 days of depositions. For instance, he continually supplied new computer printouts  even three during trial and one after the trial. Although plaintiff's lawyer felt that defendant's claims were outrageous, she still had to take them seriously  otherwise *194 her client would have been faced with a judgment for more than twice her assets, including the loss of her house.
Without prevailing on any issue against the plaintiff individually, defendant incurred, but refused to pay, his own legal fees, probably in excess of those charged by plaintiff's attorneys. At a minimum, defendant's attorneys spent more time on his fabricated claims than plaintiff's attorneys spent.

E.

There is no cap on the amount of fees to be awarded in this case.
Totally ignoring the fact that the purpose of the act is to deter parties from bringing baseless litigation, defendant argues that the "agreed compensation" between the aggrieved party and his or her counsel is a "cap" for the attorneys' fees which may be assessed against the party who violates the act. Defendant's position lacks legal support and is contrary to the language and purpose of the act.
"The underlying rationale of `fee shifting' is, of course, punitive." Hall v. Cole, 412 U.S. 1, 4-5, 93 S.Ct. 1943, 1945-46, 36 L.Ed.2d 702 (1973).
In Somerset Trust Co. v. Sternberg, 238 N.J. Super. 279, 569 A.2d 849 (Ch.Div. 1989), the court noted that the statute was "punitive in nature." Id. at 286, 569 A.2d 849.
Judge Jack Weinstein, in his widely-cited opinion construing Fed.R.Civ.P. 11, Eastway Const. Corp. v. City of New York, 637 F. Supp. 558 (E.D.N.Y. 1986), cert. den., 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), points out that among the factors to be considered by a court in determining the amount of Rule 11 sanctions are: 1) "whether there was vindictiveness or a desire to punish an opponent"; 2) "the ability (of the wrongdoer) to pay"; and 3) "the degree of frivolousness...." Id. 637 F. Supp. at 571.
*195 The fee sought by plaintiff is fair, reasonable and consistent with the language and purpose of the act, and is necessary in light of defendant's oppressive and unrelenting pressing of the litigation with three successive attorneys.
If defendant did not want to be faced with the payment of plaintiff's counsel fees, he should have considered this likelihood before he remained in plaintiff's house and pressed through a three-week trial his numerous baseless, malicious and frivolous claims. Defendant is in a far better position to bear the costs than plaintiff. He was mindful of the eventual costs while he was enjoying both the litigation and his continued residence in plaintiff's home rent free for 15 months after he was told to leave.
Defendant must be severely sanctioned as a deterrence to him and others for pursuing baseless claims with such outrageous conduct. Should a multi-millionaire, who in bad faith harasses another person, files pleadings he knows to be false, knowing that person is of modest means and now has to sell her home and completely change her lifestyle, be exonerated from paying enormous counsel fees when that person cannot afford them? If so, the purpose of the act could be frustrated by the wealthy.
Unlike the normal measure of damages, in assessing Fed. R.Civ.P. 11 sanctions, the "impact on the person against whom they are assessed must ... be considered and [the] ability to pay" should be "a factor in determining reasonableness." Schwarzer, "Sanctions Under the New Federal Rule 11  A Closer Look," 104 F.R.D. 181, 203, n. 22 (1985) (citing Colucci v. New York Times Co., 533 F. Supp. 1011, 1013 (S.D.N.Y. 1982)).
The Third Circuit Court of Appeals held that the sanctioned party's ability to pay should be a "particularly relevant equitable factor" in the calculation of Rule 11 sanctions. This is so because "the deterrent effect of an award of attorney's fees depends on the extent of the sanctioned party's resources." Doering v. Union County Board of Chosen Freeholders, 857 F.2d 191, 195, 196 (3 Cir.1988). This factor is even more *196 significant under the act. Unlike Rule 11, the act states that in determining an appropriate sanction, the court must consider "any other factors relevant in evaluating fees and costs." N.J.S.A. 2A:15-59.1c(1). Thus, the language should be interpreted expansively to include the nonmoving party's ability to pay.
In Blanchard v. Bergeron, a fee award was made pursuant to 42 U.S.C.A. § 1988 in the United States District Court. Upon appeal defendant contended that the fee award should be limited by the contingent fee arrangement between the attorney and client. The court of appeals held that the contingent fee agreement between the attorney and client "serves as a cap on the amount of attorney's fee to be awarded." 831 F.2d 563, 564 (5 Cir.1987). It limited the fee to what would have been paid by the client to the attorney.
The United States Supreme Court reversed, holding that the arrangements between the attorney and client "should not determine the Court's decision. The criterion for the Court is not what the parties agree but what is reasonable." 489 U.S. 87, 92, 109 S.Ct. 939, 943, 103 L.Ed.2d 67 (1989). The Court cited Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), which "directed lower courts to make an initial estimate of reasonable attorney's fees by applying prevailing billing rates to the hours reasonably expended on successful claims." Id. 489 U.S. at 94, 109 S.Ct. at 945. The Court then stated:
And we have said repeatedly that "[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." Blum v. Stenson, 465 U.S. 886, 888 [104 S.Ct. 1541, 1543, 79 L.Ed.2d 891] (1984). [Id. 489 U.S. at 94, 109 S.Ct. at 944.]
The Court went on to say that "a strong presumption that the lodestar figures  the product of reasonable hours times a reasonable rate  representing a `reasonable fee' is wholly consistent with the rationale behind the usual fee shifting statute," citing Pennsylvania v. Del. Valley Cit. Council for Clean Air, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), upon *197 reargument 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987), and concluded:
It is central to the awarding of attorney's fees under § 1988 that the district court judge, in his or her good judgment, make the assessment of what is a reasonable fee under the circumstances of the case. The trial judge should not be limited by the contractual fee agreement between plaintiff and counsel. [489 U.S. at 96, 109 S.Ct. at 946.]
See also Singer v. State, 95 N.J. 487, 499, 472 A.2d 138 (1984), cert. den. 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984).
On December 10, 1990, because of plaintiff's severe financial plight, her attorneys agreed to accept, in settlement of legal fees, a note and mortgage on her house for $86,000 without interest in addition to the $48,801 she had paid for legal services up to the conclusion of the trial, unless there is an appeal.
The reduced fees agreed to between plaintiff and her attorneys do not impose any ceiling on the award of attorneys' fees.
A court should not allow counsel fees in excess of those considered reasonable by counsel simply because they are now to be paid by an adversary instead of a client. Bung's Bar & Grille, Inc. v. Florence Tp., 206 N.J. Super. 432, 477, 502 A.2d 1198 (Law Div. 1985). On the other hand, a defendant responsible for an award under the act should not be permitted to avoid payment of reasonable attorneys' fees solely because he has caused the plaintiff's inability to pay the fees.
If there were a cap on legal fees, defendant would be spared paying $29,613.10 [($164,414.10 (attorney fees of $160,848.75 plus costs of $3,565.35) less $134,801 received or to be received from plaintiff]. Plaintiff has paid $14,228.13 for litigation costs.

F.

Plaintiff is entitled to be reimbursed for all litigation costs, including expert witness fees and costs of depositions.
Defendant asserts that, although the act authorizes the recovery of "all reasonable litigation costs," those costs are *198 "limited to transcript expenses and statutory witness and filing fees." Defendant's interpretation of the act is unduly restrictive and erroneous. Earlier drafts of the act contained a $2,500 cap on an award of attorneys' fees and did not include litigation costs as a basis for compensation.[8] Those limitations were deleted in the final text, creating a more potent weapon.
The experts employed by plaintiff were necessary to her defense against defendant's malicious and vengeful claims and eventually played crucial roles in the trial. Without their participation plaintiff would not have been able to establish her entitlement to the relief that she was granted or to the defenses which she sustained. Therefore, these fees constitute "reasonable litigation costs."
The real estate appraiser and expert, Norman J. Goldberg, RM, IFAS, whose testimony the court accepted, was necessary to establish the fair market rental value of plaintiff's home and to refute defendant's spurious, but vigorously litigated, claim that he was entitled to be reimbursed for large expenses paid. The court employed Goldberg's testimony in awarding $8,533.75 to plaintiff for the fair market rental value of a portion of her home from the time that she told defendant to vacate until the court ordered him to leave.
Barry Eckenthal, C.P.A., was employed by plaintiff to make an analysis of what defendant owed to her and to Irma's Bag Livingston. This was necessary to prove that if funds were to be reallocated "the Plaintiff would be owed money from Salbin & Sachsel, and not the other way around as the defendant's accounting purports to show" and in plaintiff's defense against defendant's fabricated claim that he was entitled to share in the installment payments for the sale of the business.
*199 Defendant sought reimbursement for the original cost of furniture purchased by him and used in plaintiff's home. He was not satisfied with the return of the furniture, which plaintiff offered. Therefore, plaintiff retained Charles Crane, a furniture appraisal expert, who testified as to the fair market value of the subject furniture should the court have dignified defendant's claim for monetary reimbursement rather than require defendant to take his furniture as plaintiff urged.
These expert witnesses were necessary to plaintiff in her defense of defendant's harassing and malicious claims. Their charges of $8,275 were reasonable litigation costs.
Both New Jersey and federal courts have ruled that a trial court, in its discretion, may award to a prevailing party the fees of experts whose participation was crucial to success. Interpreting N.J.S.A. 22A:2-8, the court in Bung's Bar & Grill, Inc. v. Florence Tp., supra, awarded as costs to plaintiff in a civil rights case the fees of three expert witnesses, finding that "[t]his result would not have been possible without the expert testimony produced by the plaintiffs... such testimony was a necessity;" and "its absence would have denied plaintiffs any chance of success." 206 N.J. Super. at 478, 502 A.2d 1198. The court cited, in support of its ruling, In re Caruso, 18 N.J. 26, 112 A.2d 532 (1951), where the Supreme Court stated that a court of equity in its discretion could order the reasonable costs of producing expert opinion evidence "where expert opinion evidence is essential to the resolution of the issue...." Id. at 39, 112 A.2d 532 (cited in 206 N.J. Super. at 481, 502 A.2d 1198).
The United States Supreme Court recently held that attorneys' fees and expert fees are separate elements of litigation costs, and statutory authorization for award of attorneys' fees under 42 U.S.C.A. § 1988 does not include award of expert fees. West Virginia University Hospitals, Inc. v. Casey, ___ U.S. ___, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). The Supreme Court noted that "[a]t least 34 statutes in 10 different titles of the U.S.Code explicitly shift attorney's fees and expert witness *200 fees." Id. 111 S.Ct. at 1142. The act, however, specifically permits recovery of "litigation costs."
Both the Bung's Bar and the In re Caruso cases were cited authoritatively in Kowaleski v. Allstate Ins. Co. 238 N.J. Super. 210, 569 A.2d 815 (App.Div. 1990) where the court noted that the costs of expert witnesses' fees "might be considered elements of the costs of proving [a] claim, thus subject to a discretionary award by a court." Id. at 218, n. 4, 569 A.2d 815. The court referred particularly to the last clause of N.J.S.A. 22A:2-8, which follows the list of specific costs which may be awarded. That clause mentions "such other reasonable and necessary expenses as are taxable according to the course and practice of the court or by express provision of law, or rule of court."
The single authority cited by defendant for the proposition that expert witness fees cannot be recovered as litigation costs under the act, Helton v. Prudential Property & Cas. Ins. Co., supra, is clearly distinguishable from this case because it involved a claim for PIP benefits under the No-Fault Law which permits an award of only counsel fees to a successful claimant.
Where the nonprevailing party has committed abusive litigation practices, authority exists for recovery of expert witness fees as costs, in the discretion of the court. In Kinnear Weed Corp. v. Humble Oil & Refining Co., 441 F.2d 631 (5 Cir.1971), cert. den. 404 U.S. 941, 92 S.Ct. 285, 30 L.Ed.2d 255 (1971), where plaintiff had fraudulently accused defendant and a third party of altering evidence, the trial court granted a judgment for defendant, awarding counsel fees and expert witness fees. The circuit court affirmed, stating:
The general rule is that the district court can award such fees and costs when an unfounded action or defense is maintained in bad faith, vexatiously, wantonly or for oppressive reasons. 6 J. Moore, Federal Practice § 54.77(2) at 1352 (2d Ed. 1966). If there ever was a case that fits this general rule, this is it. [Id. at 637.]
Likewise, if there ever were a case that justifies an award of witness fees and costs, this case is it.
*201 Plaintiff is entitled to recover the costs of depositions of $5,953.13. Although costs normally are allowed to a prevailing party, R. 4:42-8(a), their allowance is discretionary. In determining what costs may be allowed, in the absence of specific authorization by Supreme Court rule, the court must find statutory authority. U.S. Pipe, etc. v. United Steelworkers of America, 37 N.J. 343, 355, 181 A.2d 353 (1962).
N.J.S.A. 22A:2-8 provides that "a party ... is entitled to include in his bill of costs his necessary disbursements" including "[t]he costs of taking depositions when taxable, by order of the court...." Finch, Pruyn & Co. Inc. v. Martinelli, 108 N.J. Super. 156, 159, 260 A.2d 259 (Ch.Div. 1969). In addition to the fact that the costs of depositions are "litigation expenses" allowable under the act, the broad language of our rule and statute also provide authority for the recovery of the costs of depositions. Bung's Bar & Grille, Inc. v. Florence Tp., supra, 206 N.J. Super. at 486, 502 A.2d 1198.

III.

Reasonableness and Amount of Attorneys' Fees and Other Litigation Expenses.

A.

The hourly rate charged by plaintiff's attorneys is reasonable and in line with charges made by the larger law firms in the locality.
Plaintiff's lawyer, Margaret Dee Hellring is an outstanding litigator, who the court found to be exceptional against three competent, tenacious adversaries, one a renowned expert in constitutional law. Her ability has no relationship to the number of years that she has practiced. She was thoroughly prepared to meet all challenges. No lawyer could have done a better job for her client. The court did not need expert testimony to know this. She was admitted to the bar in 1975 after distinguished academic achievements and a judicial clerkship. *202 She became a partner in her law firm in 1979 and specializes in litigation. Her customary hourly charge is $225 an hour except for court time for which she charges $250 an hour. One of her associates, who worked 83 hours on issues involving plaintiff individually, which services were necessary and not redundant, were billed at $160 an hour.
Defendant questions Hellring's hourly rate because she has been admitted to the bar for only 15 years and had minimal participation in bar association activities until recently. He also questions a higher rate for court time. He contends, without factual support, that her charges are higher than those generally charged by other large firms in the locality. R.P.C. 1:5(a)(3).
Hellring testified that her fees and those of others in her office are based primarily on "skill and experience."
Based solely upon the certification of defendant's first lawyer, who had to make a motion to the court to be relieved because defendant refused to pay the balance of $40,450.96 of the $126,906.38 legal fee claimed, calculated upon $200 an hour, the services rendered by plaintiff's attorneys were reasonably necessary. More important, this court is satisfied that they were necessary because of the multitude of issues raised by defendant as well as the unbelievable amount of records compiled and continually revised by him.
At the hearing for attorneys' fees, defendant produced Thomas O'Brien, a partner in Wolff & Samson, who testified that, although he had read of Hellring's experience, he had no personal knowledge of her skills nor had he inquired as to her skills, ability, experience or reputation. He also knew very little about the case, had not read the pleadings, was not familiar with the trial testimony and had not even read the court's opinion. His opinion was that the rate for these types of services was in the neighborhood of $175 "for someone of Ms. Hellring's experience. Of course, I do not know of her ability." He indicated that if she had been admitted a few years earlier, her fees "could be $190 to $210."
*203 James C. Orr, a partner in Wilson, Elser, Moskowitz, Edelman & Dicker for seven years, has been involved in firm management of his firm, supervising 50 lawyers. Prior to 1983, he was the number two litigator in another prestigious Newark law firm. He stated that the factors used in determining fees were level of expertise and experience, not necessarily years of admission. He also stated that there are differences based upon locality. Since his firm was a national one with ten offices, he was aware of the geographical differences. He stated that the legal services for plaintiff were necessary because most discovery emanated from defendant's counterclaim and if defendant had prevailed on the counterclaim, plaintiff would have been faced with a judgment of more than one million dollars. It was the Hellring firm's obligation to prepare as if these claims were real. Although defendant's first lawyer spent over 700 hours up to July 31, 1990, the Hellring firm had spent approximately 500 hours.
Orr concluded that staffing of the matter was handled in the most efficient manner to effectively represent the client, and the fees were also appropriate to the result obtained. Orr stated that the Hellring fees[9] are comparable to other similarly situated practitioners. The ranges varied, but most other large firms had a range with a top higher than the Hellring firm and also a lower bottom. Orr indicated that lawyers in Denville, where defendant's first lawyer was located, have a local practice where rates are lower  not competitive with the Newark area.
Orr was personally familiar with Hellring's skills and experience and knew her reputation as a competent, aggressive, hard-nosed litigator. He found her to be extremely competent, thorough and diligent. This court agrees.
Based upon Orr's review of all pertinent papers, the nature of the case and its complexity, and Hellring's skill, experience and *204 reputation, he opined that the fees charged by her firm were reasonable, entirely appropriate and consistent with rates charged in her community for this type of litigation.
Orr opined that some firms do charge different fees for court time than for office time, but it all evened out. He concluded that the differentiation between court-room time and out-of-court time is a reasonable method of billing a client for litigation services based upon the fact that court-room skills are more specialized and the fact that an attorney is generally unavailable to do any significant work for other clients while he is engaged in trial.
R.P.C. 1.5 defines the factors which determine attorneys' fees as a matter of ethical discipline. The same standards are applicable to legal fees, whether fixed by a court or set between lawyer and client. The norms are:
(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
1. the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
2. the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
3. the fee customarily charged in the locality for similar legal services;
4. the amount involved and the results obtained;
5. the time limitations imposed by the client or by the circumstances;
6. the nature and length of the professional relationship with the client;
7. the experience, reputation, and ability of the lawyer or lawyers performing the services;
8. whether the fee is fixed or contingent.
Since defendant alleged that plaintiff's 45-page affidavit of services was not sufficiently detailed to show reasonable necessity for the services, the court, over plaintiff's objection, granted defendant's request for discovery, production of documents and a plenary hearing at which plaintiff's attorney was examined for two days. Therefore, this issue is moot.
A significant factor is an attorney's normal billing rate as this generally reflects the reasonable value of that attorney's *205 time. Black Grievance Comm. v. Philadelphia Elec. Co., 802 F.2d 648, 652 (3 Cir.1986).
The efficient staffing of a matter within the law firm is important in determining reasonable expenditure of hours. Hensley v. Eckerhart, supra, 461 U.S. at 433-434, 103 S.Ct. at 1939-40. There was efficient staffing herein.
A review of the work done in the matter, as revealed in plaintiff's affidavit of services, along with consideration given to the complexity and contentiousness of the matter, makes it clear that the time spent was reasonable and necessary.
Application of the above standards to the case at bar mandates an award of fees to plaintiff's counsel in accordance with her affidavit of services.
Defendant alleges that even if attorneys' fees are awarded against him, he is not liable for any services by plaintiff's attorneys until he "appeared" in this action because the complaint would have to have been filed anyway. This court does not have to determine whether attorneys' fees could ever be awarded if there was a default judgment and a defendant never asserted any defense. In this case, defendant resisted everything from the time he refused to leave plaintiff's home, continuing with his first court appearance with his lawyer on November 16, 1989 through the conclusion of the trial on December 13, 1990. Defendant's contention that no fees should be awarded for the period prior to November 16, 1989 is unwarranted and contrary to the purpose and intent of the act. The clear wording of the act allows an award for "all reasonable litigation costs and reasonable attorneys fees." The attorneys' fees became necessary because litigation became necessary on October 27, 1989 when plaintiff retained her lawyers to eject defendant from her home  not when he first appeared in court. The amount of these fees up to November 16, 1989 is *206 $7,400.[10]

B.

The amount of fees through the trial.
Plaintiff seeks reimbursement of attorneys fees of $171,060 ($163,048.75 for the case involving her individually and $8,011.25 for services to Bene New Hope, Inc.) plus expenses. Justice and equity demand a recovery of the $163,048.74 less two items, discussed infra, for services reasonably required. The court denies recovery for services performed on April 9, 16, 26 and 27 for the Bene New Hope, Inc. partial summary judgment motion or not allocated from other services. This reduces the charges by $1,368.75.[11]
Although Bernard Hellring may well have been worth the $400 per hour that he charged for his 4.75 hours, the Court will not award more than $225 per hour for out of court time. Therefore, the fee request is reduced another $831.25.
Plaintiff is awarded $160,848.75 for legal services rendered through the trial.

C.

Attorneys fees for preparing the motion for attorneys' fees and memorandum and litigating the propriety and quantum of fees are not recoverable in this case.
Plaintiff seeks an additional $29,340 for legal services rendered after the trial in litigating the propriety and quantum of fees and expenses.
*207 One Law Division judge has found that where applications for awards of attorneys' fees are made pursuant to the Civil Rights Act, recovery may also be had for time reasonably spent in preparing the attorneys' fees motion, memorandum and in litigating the propriety and quantum of fees. Council Enterprises, Inc. v. Atlantic City, 200 N.J. Super. 431, 443, 491 A.2d 789 (Law Div. 1984).
Knowing the complexity of the issues which had to be addressed, the time necessarily spent and the thoroughness and expertise of defendant's present counsel, the court finds the fee request and expenses reasonable.
Notwithstanding, this Court finds that recovery of these fees cannot be imposed upon the nonprevailing party unless the defense of the application itself is frivolous. Such is not the case herein.

D.

Disbursements allowed.
The disbursements which accompany the attorneys' fees herein are appropriate "litigation costs" for reimbursement within the meaning of the act. Such costs as photocopying, messenger charges, filing fees, postage, etc., are reasonable and necessary litigation costs which clearly fall within the intent of the statute because they are of the type that an attorney would normally bill a fee-paying client. Council Enterprises, Inc. v. Atlantic City, supra, 200 N.J. Super. at 443, 491 A.2d 789, citing Swift v. Blum, 502 F. Supp. 1140, 1148 (S.D.N.Y. 1980); Population Services Int'l v. Carey, 476 F. Supp. 4, 8 (S.D.N.Y. 1979); Barth v. Bayou Candy Co., 379 F. Supp. 1201, 1205 (E.D.La. 1974).
The disbursements of plaintiff's attorneys of $3,565.35, being fair, reasonable and necessary are awarded. The court denies plaintiff's attorney's application to recover expenses of $579.65 incurred after trial.

*208 IV.

The act is constitutional.

A.

The act does not infringe upon the Supreme Court's constitutional exclusive power to define and regulate practice and procedure in all courts.
Defendant contends that the act violates the "separation of powers" principle of the New Jersey Constitution in that it infringes upon the rule-making authority of the New Jersey Supreme Court derived from the Constitution[12], which gives the Supreme Court the sole and exclusive power over the legal profession. Defendant asks this court to take the radical action of declaring the statute unconstitutional.
Because some of the act's standards overlap the rule, defendant argues this is a constitutional breach, "which makes the subject ultra vires for the Legislature." However, this overlapping does not constitute an encroachment of the Supreme Court's exclusive power over the bar.
From the time the Supreme Court promulgated the first rules governing the courts, R. 4:42-9 and its predecessors prohibited the allowance of counsel fees in litigation, with a few narrow exceptions. The reason was that "sound judicial administration will best be advanced by having each litigant bear his own counsel fee except in those few situations specially designated" in the rule. Gerhardt v. Continental Ins. Cos., 48 N.J. 291, 301, 225 A.2d 328 (1966); Satellite Gateway Comm. v. Musi Dining Car Co., 110 N.J. 280, 285, 540 A.2d 1267 (1988); D.E.P. v. Ventron Corp., 94 N.J. 473, 504, 468 A.2d 150 (1983). When the 1966 Judicial Conference deliberated a change in the *209 established anti-counsel fee policy, the Supreme Court decided against a change because meritorious litigation might be deterred and also because "the imposition of counsel fees as a sanction against litigants who prosecute or defend in bad faith would raise serious problems of adjudication almost necessarily requiring protracted collateral hearings for the purpose of determining a litigant's motivations." Pressler, Current N.J. Court Rules, Comment R. 4:42-9 (1990) at 967.
In 1975, the Supreme Court amended R. 4:42-9(a) to authorize the allowance of counsel fees, by adding the following:
(8) In all cases where counsel fees are permitted by statute.
Although sanctions for the institution of frivolous litigation are not specified in R. 4:42-9, the rule's "permitted by statute" language effectively subsumes all counsel fee statutes as one of the categories allowed. Without that wording, every counsel fee statute, being a matter of "procedure," would be constitutionally infirm unless it provided for those fees under circumstances which were also authorized under the court rules. See Lynch, "The New Jersey Supreme Court and the Counsel Fees Rule: Procedure or Substance and Remedy?", 4 Seton Hall L.Rev. 19 (1972) (Part I) and 4 Seton Hall L.Rev. 421 (1973) (Part II). Thus, the act does not violate the constitutional mandate that the Supreme Court have exclusive jurisdiction over the practice and procedure in the courts because the court rules expressly authorize counsel fees where "permitted by statute."
R. 4:42-9(a) prohibits state courts from awarding counsel fees except as provided in the eight subsections of that rule. There are at least 168 New Jersey statutory provisions expressly authorizing the shifting of one person's counsel fees to another person  typically a prevailing party in litigation. In addition, several cases have interpreted other state statutes as permitting the award of counsel fees. Under many of these statutes, counsel fees are mandatory, although most make the allowance discretionary, Duffy, "201 New Jersey Counsel Fees Statutes", 127 N.J.L.J. Index Page 340 (Feb. 7, 1991).
*210 There is no conflict between the act and the court rules. This is not a case like Winberry v. Salisbury, 5 N.J. 240, 74 A.2d 406 (1950), cert. den. 340 U.S. 877 (1950), where there was a direct conflict between a court rule and a statute concerning the time to appeal from a final judgment of the trial division of the Superior Court or a case like Matter of Hearing on Immunity for Ethics Complainants, 96 N.J. 669, 477 A.2d 339 (1984), where there was a direct conflict between a Supreme Court opinion and a statute concerning the amenability of ethics complainants to malicious prosecution actions by their former attorneys. However, the act supplements the court rule or as a commentator notes: "[T]he Statute fills in the gaps left by the court rules concerning sanctions." Nissenbaum and Lem, "Stop, Look and Listen, Selected Defenses to the New Jersey Frivolous Law Suit Statute," 20 Seton Hall L.Rev. 184, 191.
Defendant attacks the constitutionality of the act theorizing that it conflicts with the court rule because the "statute" referred to in R. 4:42-9(a)(8) must be a "substantive" rather than "procedural" statute, and the act is "procedural" in nature. Although R. 4:42-9(a)(8) does not characterize the type of statute to which it refers, the distinction between "substantive" and "procedural" matters is very difficult to draw. In Busik v. Levine, 63 N.J. 351, 307 A.2d 571 (1973), app. dism. 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973), the Supreme Court sustained a court rule authorizing the award of prejudgment interest in tort cases, while acknowledging that the rule had "substantive" consequences:
And finally, it is simplistic to assume that all law is divided neatly between "substance" and "procedure." A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account. Speaking of the proposition that a court may not promulgate rules governing substantive law in the exercise of their rule-making power, Professors Levin and Amsterdam agreed that "rational separation is well-nigh impossible." "Legislative Control Over Judicial Rule-making: A Problem in Constitutional Revision," 107 U. of Pa.L.Rev. 1, 14-15 (1958)." [Id. 63 N.J. at 364-365, 307 A.2d 571].
Defendant argues that the act raises the possibility of an impotent judiciary immobilized by the straitjacket of the act. That is not reasonably likely. If the Supreme Court should find *211 that the courts cannot function properly because of the act (a proposition for which no supporting evidence exists), it can amend the court rules accordingly. As the Court stated in Knight v. Margate, 86 N.J. 374, 431 A.2d 833 (1981):
We do not believe that the restrictions imposed by the latest amendments ... will in any way interfere with the sound administration of the judicial system or undermine the proper regulation of the ethical conduct of members of the judiciary and the bar. Any possible doubts on this score dissipate in light of this Court's overriding constitutional authority to adopt and fashion its own regulatory and ethical requirements for the judicial branch and the practicing bar at any time it becomes appropriate to do so regardless of the Legislature's action. [at 394, 431 A.2d 833; emphasis supplied]
In Knight, the Court expressly rejected the argument that the existence of a court rule dealing with an area of judicial authority precluded the Legislature from passing laws dealing with the same subject. Ibid.
An analysis of defendant's position indicates that what he is really challenging is the wisdom of the act rather than the authority of the Legislature to enact the statute. Courts, asked to pass on the constitutionality of statutes, do not probe into the wisdom of the statutes but only the power of the Legislature to enact them. As the Court stated in N.J. Sports & Exposition Authority v. McCrane, 61 N.J. 1, 292 A.2d 545 (1972):
The judicial branch of the government does not and cannot concern itself with the wisdom or policy of a statute. Such matters are the exclusive concern of the legislative branch, and the doctrine is firmly settled that its enactment may not be stricken because a court thinks it unwise. [at 8, 292 A.2d 545]
As Justice O'Hern stated in Coleman v. Fiore Bros., 113 N.J. 594, 552 A.2d 141 (1989), the object of all counsel fees, appurtenant to statutes creating substantive rights, is "to attract competent counsel in cases involving an infringement of statutory rights, to achieve uniformity in those statutes and to ensure justice for all citizens." Id. at 598, 552 A.2d 141.
Defendant contends that the act is not characteristic of substantive law, which effectuates important public policies, creates private enforcement rights and is implemented by entitlements to damages and reasonable counsel fees.
*212 However, the purpose of the act, according to the sponsor's statement, in connection with Assembly Bills 1316 and 751, was concerned with abuses of the process of litigation, which is not devoid of any substantive content since it seeks to punish unwarranted recourse to the civil justice system.
Our Constitution provides that the Supreme Court has "jurisdiction over the admission to the practice of law and discipline of persons admitted." Emphasis supplied. It does not specifically authorize the disciplining or sanctioning of litigants. In addition, the rules of professional conduct are binding only upon the attorney, not a party who may have misled his attorney regarding the facts of the case.
Defendant contends that of the two prongs that permit an award, the first, evilly motivated litigation, "solely for the purpose of harassment, delay or malicious injury," is uniquely and distinctively procedural and conflicts with R. 1:4-8 which deals with badly motivated litigation and which limits the consequences to an attorney for breach of the rule to striking of a pleading or a motion. See Berthelsen v. Hall, 194 N.J. Super. 22, 26, 475 A.2d 1275 (App.Div. 1984). However, R. 1:4-8 does not in any way control a party's actions or punish any conduct of a party. Therefore, the act does not conflict with this rule.
Defendant contends that the other prong that permits an award, that the nonprevailing party knew or should have known that his pleaded claims or defenses were "without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law," is distinctively a procedural overlay, of the very kind now conducted and regulated by R. 4:42-9(a)(1), (2) and (3). However, the act punishes litigants' willful abuse of the civil justice system, which is not at cross purposes to the central philosophy of the rules system.
The issue of the constitutionality of the act has been thrice noted and passed over, twice because it was not raised by a *213 party and once, by the Appellate Division, because counsel fees were reversed on other grounds. Evans v. Prudential, supra; Somerset Trust Co. v. Sternberg, supra; Iannone v. McHale, supra.
In the only other case where plaintiffs attacked the constitutionality of the act, claiming it is void for vagueness and interferes with the judiciary's exclusive prerogatives accorded by N.J. Const. (1947), Art. VI, § 2, par. 3, the court found it unnecessary to consider the constitutional challenges. Iannone v. McHale, supra, 245 N.J. Super. at 24, 583 A.2d 770. The court did, however, discuss the act and construed parts of it.
The evident intention of N.J.S.A. 2A:15-59.1 was to superimpose upon state court practice not only the intended effect but also the implementing technique of Fed.Rule Civ.P. 11. Id. at 26, 583 A.2d 770.
Fed.R.Civ.P. 11 prescribes a conjunctive two-prong test for sanctionable baselessness: improper motive and a litigation position unfounded in fact and law. See, e.g. Zaldivar v. City of Los Angeles, 780 F.2d 823, 829 (9 Cir.1986). The similar, but disjunctive, two-part test of the act is also one of objective reasonableness. 245 N.J. Super. at 29, 583 A.2d 770. The logic that deplores frivolous lawsuits holds true for frivolous defenses.
A statute is presumed to be constitutional. Only in extraordinary cases will a court invalidate a statute. As the Supreme Court stated in N.J. Sports and Exposition Authority v. McCrane, supra:
One of the most delicate tasks a court has to perform is to adjudicate the constitutionality of a statute. In our tripartite form of government that high prerogative has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives. As a result, judicial decisions from the time of Chief Justice Marshall reveal an unswerving acceptance of the principle that every possible presumption favors the validity of an act of the Legislature. As we noted in Roe v. Kervick, 42 N.J. 191, 229, 199 A.2d 834 (1964), all the relevant New Jersey cases display faithful judicial *214 deference to the will of the lawmakers whenever reasonable men might differ as to whether the means devised by the Legislature to serve a public purpose conform to the Constitution. And these cases project into the forefront of any judicial study of an attack upon a duly enacted statute both the strong presumption of validity and our solemn duty to resolve reasonably conflicting doubts in favor of conformity to our organic charter. Moreover, the conclusions reached in such cases demonstrate that in effectuating this salutary policy, judges will read the questioned statute as implying matters requisite to its constitutional viability if it contains terms which do not exclude such requirements. [61 N.J. at 8, 292 A.2d 545].
A second and related rule of statutory construction is that when a statute is attacked as an unconstitutional infringement upon the authority of the judiciary, the court will seek to harmonize the positions of the legislative and judicial branches and will nullify the statute only when it directly and substantially interferes with the court's ability to perform its functions.
In Knight v. Margate, supra, the Supreme Court sustained an amendment to the New Jersey Conflict of Interest Law which prohibited various individuals, including members of the judiciary, from certain dealings with casinos. The parties challenging the law, like defendant herein, alleged that the statute conflicted with N.J. Const. (1947), Art. VI, § 2, par. 3. In discussing the doctrine of "separation of powers" the Court declared:
The constitutional doctrine of the separation of powers denotes not only independence but also interdependence among the branches of government. Indeed, the division of governmental powers implants a symbiotic relationship between the separate governmental parts so that the governmental organism will not only survive but will flourish. E.g. State v. Leonardis, 73 N.J. 360 [375 A.2d 607] (1977); cf. City of Hackensack v. Winner, 82 N.J. 1 [410 A.2d 1146] (1980). "The separation-of-powers doctrine contemplates that the several branches will cooperate to the end that government will succeed in its mission." [Citations omitted]
....

[W]hile the judicial power is paramount and exclusive, it need not in every context or application be preclusive. Implicit in the decisional law is the distinction between the existence and the exercise of the judicial powers. The cases show that, although the constitutional authority of the Supreme Court over the judicial branch of government is preeminent, this does not mean that this authority must invariably foreclose action by the other *215 branches of government. This is so particularly where the judicial power has not been exercised or fully implemented, and where such action by the other branches serves a legitimate governmental purpose and, concomitantly, does not interfere with judicial prerogatives or only indirectly or incidentally touches upon the judicial domain.

We conclude therefore that in the full enjoyment of its paramount and exclusive powers over the judicial branch, the Supreme Court has the authority, reasonably to be implied under the twin principles of the separation and interdependence of governmental powers, to permit or accommodate the lawful and reasonable exercise of the powers of other branches of government even as that might impinge upon the Court's constitutional concerns in the judicial area. The constitutional validity of such action by another branch of government, and the Supreme Court's ultimate power to accept or reject such action, turn upon the legitimacy of the governmental purpose of that action and the nature and extent of its encroachment upon judicial prerogatives and interests. [86 N.J. at 388-391, 431 A.2d 833; emphasis supplied]
In State v. Roberson, 246 N.J. Super. 597, 588 A.2d 434 (App.Div. 1991), defendant's attorney contended unsuccessfully that a statute (establishing a pretrial procedure for rendering admissible certificates of state laboratory results) is invalid even if it is a rule of procedure and not a rule of evidence because, under the Constitution, the Supreme Court has exclusive jurisdiction to "make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts." N.J. Const. (1947), Art. VI, § 2, par. 3.
The Appellate Division concluded that it saw no reason why the Supreme Court would object to the statute, whose provisions it concluded are fair and reasonable, and serve a legitimate governmental purpose. In these circumstances, the Supreme Court does not insist on exercising its constitutional authority to the exclusion of the Legislature. 246 N.J. Super. at 605, 588 A.2d 434. N.J.S.A. 2C:35-19 does not interfere with the judicial prerogatives of the Supreme Court. It is therefore constitutional even though it may affect the practice and procedure of the courts in the State. 246 N.J. Super. at 606, 588 A.2d 434.
Likewise, our Supreme Court in Busik v. Levine, supra, declared:

*216 ... [T]he issue of exclusivity involves a touchy matter, the relations among the three branches of government. It will be time enough to talk about exclusivity when there is an impasse and no way around it. A coordinate branch should not invite a test of strength by proclamation. Our form of government works best when all branches avoid staking out the boundaries which separate their powers. [63 N.J. at 373, 307 A.2d 571; emphasis supplied]
In Busik, the Court cited the Evidence Act of 1960 (N.J.S.A. 2A:84A-1 et seq.) as an example of cooperation by the three branches of government. 63 N.J. at 367-368, 307 A.2d 571. It also cited the following court rules which "expressly accept statutory provisions relating to the same subject matters": R. 4:27-2; R. 4:42-8(a); R. 4:52-7; R. 4:59-1 (63 N.J. at 373) and also referred to the New Jersey Tort Claims Act, a portion of which dealing with public entities and public employees was approved in R. 4:52-11(b). 63 N.J. at 373, 307 A.2d 571. See also Passaic Cty. Probation Officers' Ass'n v. Cty. of Passaic, 73 N.J. 247, 374 A.2d 449 (1977) (Employer-Employee Relations Act regulating employment of probation department employees sustained as not in conflict with Supreme Court's constitutional powers of supervision of court system); Stroinski v. Office of Public Defender, 134 N.J. Super. 21, 338 A.2d 202 (App.Div. 1975) (Public Defender Act providing for lien upon property of indigent person represented by public defender sustained as not in conflict with court rule governing award and allocation of counsel fees).
Defendant's argument that the act conflicts with the court rules and jeopardizes the functioning of the courts ignores the constitutional requirement that a court accommodate wherever possible the directives of a coordinate branch of government and not substitute its judgment for that of the coordinate branch.

B.

The act serves a legitimate public purpose.
In adopting the act, the Legislature responded to a serious problem, an explosion of unnecessary litigation which places *217 needless strain upon the State's taxpayers and threatens to erode public confidence in the State's judicial system. As noted in a widely cited article discussing Fed.R.Civ.P. 11 upon which the act is based:
The growing cost, complexity and burdensomeness of civil litigation has been a serious concern to judges, lawyers and the public. There is no single cause nor is there a single remedy for this problem. But there is considerable opinion, supported by at least anecdotal evidence, that misuse and abuse of the litigation process have contributed to the problem. Resort to frivolous litigation, maintenance of baseless defenses, and harassment of one's opponent are practices that judges and lawyers engaged in civil litigation encounter regularly.
... These practices tend to impose unjustified burdens on other parties, frustrate those who seek to vindicate their rights in the Courts, obstruct the judicial process, and bring the civil justice system into disrepute. [Schwarzer, "Sanctions Under the New Federal Rule 11  A Closer Look," 104 F.R.D. 181, 182 (1985)].
The purpose of the act is to deter frivolous practices by authorizing the court to impose sanctions upon offending parties. As of 1989, similar statutes existed in Alabama, Colorado, Connecticut, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Minnesota, New Hampshire, New York, Ohio, Oklahoma, Oregon, Rhode Island, Texas, Virginia and Wyoming. See Nissenbaum and Lem, "Stop, Look and Listen: Selected Defenses to the New Jersey Frivolous Lawsuit Statute," 20 Seton Hall L.Rev. 184, 186, n. 6 (1984). The act, in the words of the Knight case, "serves a legitimate governmental purpose." 86 N.J. at 390, 431 A.2d 833. Statutes authorizing awards of attorneys' fees, based upon bad faith or frivolousness, have been upheld. 20 C.J.S., Costs, § 128 at 108.
Prior to enactment of the act, redress for abuses by a party or attorney in the course of litigation was available under the court rules, ethics rules and the common law. There is nothing in the plain language of the act which would curtail any of those rights. Although there are many theories on which to base sanctions or damages for frivolous litigation, the Legislature nevertheless felt compelled to create the act. Perhaps even more significantly, the Appellate Division of the Superior Court as recently as 1984 invited the New Jersey Supreme *218 Court, to amend the court rules in that regard. Berthelsen v. Hall, supra, 194 N.J. Super. at 26, 475 A.2d 1275. Although the Supreme Court has not done so, the Legislature has, by adopting the act.
There are a wide variety of New Jersey court rules which provide for sanctions in response to abuses by litigants or their attorneys in the course of litigation. The act fills in the gaps left by the court rules concerning sanctions and is more expansive than the narrowly construed torts, such as malicious prosecution and abuse of process, providing a legal "safety net" to catch frivolous acts in the course of litigation that might otherwise slip through unredressed.
Absent the presence of an invidious discrimination or suspect classification that would raise the standard of review, all that the Constitution requires is that the statute be rationally related to the achievement of a legitimate state objective. Barone v. Department of Human Services, 107 N.J. 355, 365, 526 A.2d 1055 (1987) (citing Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Under the rational-basis standard the scope of review of legislative classification is extremely limited. N.J. Restaurant Assn. v. Holderman, 24 N.J. 295, 300, 131 A.2d 773 (1957); Drew Associates of NJ, LP v. Travisano, 122 N.J. 249, 584 A.2d 807 (1991).

C.

The act is not void for vagueness.
Defendant contends that even if the Supreme Court were to adopt a rule with the same language as the act, such a rule would be unconstitutional because it would be void for vagueness and it would deprive the nonprevailing party of due process.
The act limits awards to the "party who prevails in the civil action...." N.J.S.A. 2A:15-59.1a. Defendant contends that no standard is set forth for identifying the prevailing party.
*219 Whether there are single plaintiffs or defendants, a court can readily determine who prevailed on what claim. Federal and state judges have had no difficulty determining the prevailing party in civil rights actions where the court, in its discretion, may allow the prevailing party a reasonable attorney's fee. 42 U.S.C.A. § 1988.
A plaintiff must be a "prevailing party" to recover an attorney's fee under § 1988. The standard for making this threshold determination has been framed in various ways. A typical formulation is that "plaintiffs may be considered `prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Nadeau v. Helgemoe, 581 F.2d 275, 278-279 (1 Cir.1978). Hensley v. Eckerhart, supra, 461 U.S. at 432, 103 S.Ct. at 1938.
Our Supreme Court has had no difficulty determining whether plaintiffs "prevailed" within the meaning of 42 U.S.C.A. § 1988, entitling them to an award of attorneys' fees. Singer v. State, supra, 95 N.J. at 496, 472 A.2d 138.
Vagueness challenges are typically brought in contexts implicating the enforcement of criminal statutes, and are usually based on a contention that procedural due process demands that no one should be prosecuted for violation of a statute unless the statute provides adequate warning of the proscribed behavior and sufficient guidance to authorities charged with enforcement to prevent arbitrary application. E.g., State v. Lee, 96 N.J. 156, 166, 475 A.2d 31 (1984). Civil statutes in general, and economic regulations in particular, are subject to less stringent scrutiny under the vagueness doctrine. See, e.g., State v. Cameron, 100 N.J. 586, 591-592, 498 A.2d 1217 (1985) (statutes limited to civil penalties, and especially those dealing with economic regulation, are subject to a more tolerant analysis under vagueness doctrine). In the Matter of the Loans of the New Jersey Property Liability Insurance Guaranty Association to the New Jersey Automobile Insurance Guaranty *220 Fund pursuant to the New Jersey Fair Automobile Insurance Reform Act of 1990 (L. 1990, C. 8) (A-147), 124 N.J. 69, 79, 590 A.2d 210, 215 (1991).
Therefore, the act is not void for vagueness.

D.

Defendant's contention that the act denies due process of law, under both the United States and New Jersey Constitutions, in that counsel fees can be awarded on grounds never pleaded, confronted or tried is unfounded.
Under the act, the award of counsel fees can be considered only after a final determination of the merits, since the award must be to "[a] party who prevails in a civil action...." N.J.S.A. 2A:15-59.1a.
The grounds for the award are either the bad faith and bad motives of the nonprevailing party or that his position in litigation was "without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law." N.J.S.A. 2A:15-59.1b(1.2).
The act prescribes that such post-trial judgments must be made by the court "on the basis of the pleadings, discovery, or the evidence presented ..." N.J.S.A. 2A:15-59.1b. Iannone v. McHale, supra, underscores the requirement:
Section (b) expressly requires the finding of frivolousness to be based on the record already made in the matter, thus precluding routine collateral evidential forays into states of mind and nonrecord facts and circumstances. [245 N.J. Super. at 29, 583 A.2d 770]
The consequence is that the issues of bad faith, bad motives and reasonable legal basis must be decided on the record made. The fact that no new pleading is required is immaterial when the parties have had full discovery as well as a trial. The application must be made with a supporting affidavit which meets the detailed requirements set forth in the act. In addition, the nonprevailing party is entitled to a hearing.
*221 The act sets forth clear requirements which afford the nonmoving party certain due process protections.
A judicial hearing, which comports with due process requires a notice defining the issues, affording an adequate opportunity to prepare and respond before the proceedings are closed. Nicoletta v. No. Jersey District Water Supply Commission, 77 N.J. 145, 162, 390 A.2d 90 (1978). Due process necessarily includes a reasonable opportunity to be heard. Defendant had ample opportunity to respond in the 12-day trial and 4-day hearing on this motion.
The rules of court allow a judgment deciding issues never pleaded or pretried when the issues were confronted, addressed and actually and cognizantly tried before judgment was passed. R. 4:9-2. Flouro Electric Corp. v. Smith Transport Ltd., 58 N.J. Super. 287, 294, 156 A.2d 153 (App.Div. 1959). Defendant and his lawyers knew the issues because they raised them and were aware of the consequences of their actions in conducting extremely lengthy discovery proceedings, trial and post-trial proceedings.
Due process requires, at a minimum, notice and an opportunity to be heard "appropriate to the nature of the case." Goss v. Lopez, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975), quoting Mullane v. Central Hanover Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). In the case of sanctions this would seem always to require that the attorney be given notice of the motion for fees and have an opportunity to address the court before sanctions are imposed. The Supreme Court has endorsed this notion. Roadway Express, Inc. v. Piper, 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980).
The United States Supreme Court held that due process is satisfied "as long as a party received an appropriate hearing," when it affirmed a district court judge's sanction ordering a litigant to pay almost $1,000,000 for the other party's attorneys' fees. They indicated that never before had they ruled *222 that their inherent-power extended to the awarding of lawyers' fees as sanctions or that such awards may be ordered by a federal judge in a state that does not give its state judges such power. Chambers v. Nasco, Inc., ___ U.S. ___, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).
That case is very similar to this one because it "began as a simple action for specific performance of a contract, but it did not remain so." Id. 111 S.Ct. at 2128. The Supreme Court noted that the district court had found that Chambers had "filed false and frivolous pleadings and had attempted by other tactics of delay, oppression, harassment and massive expense to reduce plaintiff to exhaustive compliance." Nasco, Inc. v. Calcasieu Television & Radio, Inc. 124 F.R.D. 120, 139 (W.D.La. 1989). The court of appeals affirmed. 894 F.2d 696 (5 Cir.1990).
Defendant's reliance upon R. Wilson Plumbing v. Wademan, 246 N.J. Super. 615, 588 A.2d 444 (App.Div. 1991), is unjustified. When the trial court improperly, sua sponte, raised consumer fraud relief in a letter opinion, it was a denial of constitutional due process.
However, from the moment that defendant herein appeared in court, he and his attorneys knew or should have known that he would be faced with a claim under the act. Defendant and his attorneys together consumed thousands of hours to prevent defendant's eviction and to press frivolous claims and defenses.

Conclusion.
Judgment upon the plaintiff's application is entered without interest and without costs for:
A. attorneys' fees in the amount of $160,848.75; and
B. litigation costs in the amount of $17,793.48; a total of $178,642.23.
NOTES
[1] Defendant prevailed on the third-party complaint against a corporation owned by plaintiff.
[2] He admitted selling his 50% interest in a corporation for $9,000,000 in 1968. He testified that his present net worth was only $1,600,000 which the court did not believe.
[3] The statute was approved on June 28, 1988 and became effective 180 days after enactment.
[4] Defendant questions the propriety of this appellate holding, Iannone v. McHale, supra, 245 N.J. Super. at 29, 583 A.2d 770, but recognizes that this court is bound by it. He has preserved this issue for appeal.
[5] This is evident because defendant's present counsel, in opposing plaintiff's execution on her judgment, acknowledged that "her only substantial asset is her home which is for sale."
[6] He has further burdened the court system by refusing to pay his first lawyer, who has filed suit against defendant for alleged unpaid legal fees incurred in this proceeding.
[7] During discovery defendant, through his attorney, stipulated that the amount of $12,058.39 listed by him on his ledger sheets was due plaintiff's mother for this program but he had not paid her either. However, since she was not a party, the court could not decide that matter.
[8] See Governor's Statement to Assembly Bills 1086, 2029, 783 and 1260 (1987) (discussing the governor's support but dissatisfaction with the provision of the statute limiting an award to an unreasonably low $2,500). See also Schroth, "Frivolous Suit Bill is a Serious Possibility," 121 N.J.L.J. 877, 894 (May 5, 1988) (discussing the governor's conditional veto of the $2,500 cap).
[9] He did not mention Bernard Hellring's charges of $400 an hour.
[10] This is based on 22.5 hours for Margaret D. Hellring at $225 an hour, 12.5 hours for Jerrald D. Hochman at $160 an hour, and 1.5 hours for Bernard Hellring at $225 an hour.
[11] This is based on 5.25 hours at $225 an hour and .75 hours at $250 an hour.
[12] The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted. N.J. Const. (1947), Art. VI, § 2, par. 3.