245 N.J. Super. 17 (1990)
583 A.2d 770
JAMES IANNONE, MICHAEL STAFFORD, JOHN FEDERICO AND TERESA DOWNEY, PLAINTIFFS-APPELLANTS,
v.
MICHAEL MCHALE, MARGUERITE EMBERGER, STEVEN LIBRO, CAPE MAY COUNTY BOARD OF ELECTIONS AND THE SEA ISLE CITY DISTRICT BOARD OF ELECTIONS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 13, 1990.
Decided December 13, 1990.
*20 Before Judges PRESSLER, BAIME and A.M. STEIN, JJ.
James R. Zazzali argued the cause for appellants (Zazzali, Zazzali, Fagella & Nowak, attorneys; James R. Zazzali, of counsel and on the brief with Robert A. Fagella; Robert A. Fagella on the reply briefs).
John M. Carbone argued the cause for respondent Michael McHale (Carbone and Faasse, attorneys).
Jefferson A. Mott argued the cause for respondent Marguerite Emberger (Mott, Vernon and Mott, attorneys; Joel A. Mott, III on the brief).
Respondents Steve Libro, Cape May County Board of Elections and The Sea Isle City District Boards of Elections, did not file briefs.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is an election contest case which was terminated by a settlement agreement and stipulation of dismissal. Following the conclusion of the matter, the trial judge, for reasons explained *21 in his opinion reported at 236 N.J. Super. 227, 565 A.2d 422 (Law Div. 1989), entered an order pursuant to N.J.S.A. 2A:15-59.1, the so-called frivolous litigation statute, awarding the two represented individual defendants counsel fees to be paid by plaintiffs. Plaintiffs appeal. We reverse.
This litigation was generated by what appears to have been a bitterly contested non-partisan election conducted on May 9, 1989, for three commissioner seats on the governing body of Sea Isle City in Cape May County. There were seven candidates, six of whom were involved in this law suit. The three winners were plaintiff James Iannone and defendants Michael McHale and Steve Libro. Among the losers were plaintiffs Michael Stafford and John Federico and defendant Marguerite Emberger. Plaintiff Teresa Downey joined in the action as a duly qualified and registered voter. Defendants McHale, Libro and Emberger were identified together under the slogan Leadership Working Together Team. We assume the three plaintiff candidates were also identified together.
Confining our review to the record before us, we note first that on May 4, 1989, five days before the election was held, the Law Division, on ex parte application of defendant Cape May County Board of Elections, entered an order directing it to remove the voter registration pages of 177 Sea Isle voters who are alleged, in the main, to have favored plaintiffs' candidacies. It also appears that neither the application of the County Board nor its page-removal procedures complied with either the provisions of N.J.S.A. 19:31-15, which requires notice to voters prior to their disqualification by the board for non-residence, or with the provisions of N.J.S.A. 19:33-1, which requires such notice prior to judicial striking and which also provides that no name shall be "stricken subsequent to the sixth Tuesday preceding any election." The evident intent of these provisions is to afford persons the opportunity to defend their right to vote.
According to the affidavit of plaintiffs' attorney filed in support of their motion for reconsideration of the counsel-fee *22 order,[1] he was first consulted by plaintiffs three days after the election and proceeded forthwith to investigate their claim, assembling pertinent materials and conducting legal research. At an office conference in Newark held on May 19, the attorney expressed the preliminary view that "irregularities could be demonstrated and that there might be evidence of a prima facie case, justifying a new election." Nevertheless, the attorney "advised the client that further consideration, review, research and interviews were appropriate before a final decision would be made." About a week later, the attorney travelled from Newark to Cape May Court House, spending a day with one of the plaintiffs reviewing the pertinent election records at the County Board office. That review revealed the ex parte order and the fact that it was obtained without notice, hearing or publication and without notice to the Attorney General. The attorney was also "unable to obtain any information from the Board concerning the reasons for the order." Further attorney-client discussions ensued. According to the affidavit, plaintiffs were "aware of ex parte private meetings between the Election Board and defendants Emberger and McHale; meetings and communications between the Cape May Prosecutor and defendants Emberger and McHale; and wholesale challenges to supporters of plaintiffs which did not appear to have been based upon any criteria except partiality." The decision to contest the election pursuant to N.J.S.A. 19:29-1 to -14 was made on June 1, a week before the expiration of the 30-day limitations period prescribed by N.J.S.A. 19:29-3.
The three-count complaint, which named the County Board and the district boards of Sea Isle as well as the three candidates, was filed on June 1, 1989. The first count sought to set the election aside because of "acts of misconduct, malconduct, fraud and/or corruption" committed by the defendant boards "and persons and agents acting on behalf of and in concert with *23 them," N.J.S.A. 19:29-1a, and also because of the "prohibiting, interfering with and/or restraining the rights of duly registered voters from exercising their franchise," N.J.S.A. 19:29-1e. The second count sought to set the election aside because of the County Board's failure to comply with N.J.S.A. 19:31-15 and 19:33-1 in removing the pages of registered voters. The third count alleged that the actions of defendants had violated the right of the electorate to "exercise their franchise without interference, and their right to the election of candidates fairly elected by the majority of duly qualified voters." Each count also sought compensatory and punitive damages.
Following the filing of the complaint, plaintiffs obtained a discovery order and deposed at least some of the individual defendants. They also had marked a number of exhibits at the deposition, including a memorandum from Leadership Working Together Team to the County Board challenging over 250 voters and bearing the notation, signed by Emberger, that "[i]t is our opinion that the following people are not residents of Sea Isle City and should not participate in the election of its government." The exhibits include another duplicative list of over 170 voters challenged by Emberger as well as a tabulation by the County Board showing absentee ballots it rejected for non-residency.
Prior to the July 5, 1989, trial date, plaintiffs' attorney engaged in conversations with the Attorney General and with the attorneys for the individual defendants. He asserts that "in the first telephone conference call between the parties, Deputy Attorney General Dembe and Mr. Carbone [Emberger's attorney] asked that plaintiffs drop those claims [for compensatory and punitive damages] and affiant represented that he would." He goes on to assert that he reiterated that stipulation in open court late in June 1989 "prior to any settlement or even discussion of settlement and prior to the voluntary dismissal of the petition or discussion thereof." Nevertheless it appears that plaintiffs did not then agree to dismiss as to *24 Emberger in accordance with the relief she sought by motion returnable June 29.
Finally, during the weekend prior to July 5, plaintiffs' attorney and the Attorney General entered into a "Stipulation of Settlement and Voluntary Withdrawal of the Petition Contesting the May 9, 1989, Sea Isle City Municipal Election." We understand that by that time, the petition had already been withdrawn as against the Sea Isle district boards. In any event, the stipulation expressly recognized that the County Board's action in removing the pages of the 177 voters had not been in compliance with Title 19. The County Board undertook to correct its procedures, to advise the district boards as to the proper manner to conduct challenges, to make its records freely available to all persons, and to resolve with voters all outstanding questions of eligibility. Plaintiffs, for their part, recognized that the County Board, even if acting contrary to statute, had nevertheless acted in good faith and agreed to withdraw the complaint with prejudice and without costs. The stipulation was not executed by or on behalf of the individual defendants.
The stipulation and dismissal were presented in open court on July 5. The judge then immediately entertained defendants' application for counsel fees under N.J.S.A. 2A:15-59.1 and granted it subject to submission of affidavits of services. Ultimately the judge entered an order awarding Emberger fees in the amount of $3,900.00 plus costs of $42.70, and McHale fees in the amount of $4,500 plus costs of $2,237.29. Since Libro had appeared pro se, no award was made to him. The judge then denied plaintiffs' motion for reconsideration on timeliness grounds.
In challenging the award of counsel fees, plaintiffs attack the constitutionality of N.J.S.A. 2A:15-59.1, claiming that it is void for vagueness and interferes with the judiciary's exclusive prerogatives accorded by article 6, § 2, para. 3 of the New Jersey Constitution. We do not, however, consider the constitutional challenges since we are satisfied that the order appealed *25 from must be reversed because of the statute's misapplication in the circumstances here.
N.J.S.A. 2A:15-59.1, adopted in 1988 by L. 1988, C. 46, provides as follows:
a. A party who prevails in a civil action, either as plaintiff or defendant, against any other party may be awarded all reasonable litigation costs and reasonable attorney fees, if the judge finds at any time during the proceedings or upon judgment that a complaint, counterclaim, cross-claim or defense of the nonprevailing person was frivolous.
b. In order to find that a complaint, counterclaim, cross-claim or defense of the nonprevailing party was frivolous, the judge shall find on the basis of the pleadings, discovery, or the evidence presented that either:
(1) The complaint, counterclaim, cross-claim or defense was commenced, used or continued in bad faith, solely for the purpose of harassment, delay or malicious injury; or
(2) The nonprevailing party knew, or should have known, that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.
Paragraph (c) prescribes the required contents of the affidavit of service, requiring the application for fees to be made to the "court which heard the matter." The stated legislative purpose in enacting this provision was to deter baseless litigation. As the Sponsor's Statement attached to the Assembly Bill Nos. 1316 and 751 explains:
The purpose of this bill is to allow a party who prevails in a civil suit to recover reasonable attorney fees and litigation costs from the nonprevailing person if the judge finds that the legal position of the nonprevailing person was not justified and was commenced in bad faith solely for the purpose of delay or malicious injury, or that the nonprevailing party knew or should have known that the action was without any reasonable basis in law or equity.
Clearly this provision was patterned after the 1983 amendment of Fed.R.Civ.P. 11, whose purpose, as explained by the Advisory Committee notes, was essentially the same, namely deterring groundless suits. Prior to that amendment the federal rule, which is the analogue to and source of R. 1:4-8, provided, in almost identical language as the New Jersey rule, that the signature of an attorney to a pleading "constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information and belief there is good *26 ground to support it; and that it is not interposed for delay." The sanction for willful violation of the rule was "appropriate disciplinary action." The 1983 amendment dramatically redefined both the matters certified to and the sanction. That portion of the rule now provides that:
The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. If a pleading, motion, or other paper is not signed, it shall be stricken unless it is signed promptly after the omission is called to the attention of the pleader or movant. If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.
Although R. 1:4-8 was not amended to accord with the change in federal practice thus effected, the evident intention of N.J.S.A. 2A:15-59.1 was to superimpose upon state court practice not only the intended effect but also the implementing technique of Rule 11. Thus, although the statute has not yet been considered by an appellate court in this state, we can nevertheless turn to the vast body of federal precedent which has followed upon the heels of Rule 11 since its amendment.
We make several preliminary observations. As the Supreme Court has recently explained in Cooter & Gell v. Hartmarx Corp., 496 U.S. ___, 110 S.Ct. 2447, 2454, 110 L.Ed.2d 359, 374 (1990), while the rule must be interpreted consistently with its "central goal of deterrence," it must nevertheless "be read in light of concerns that it will spawn satellite litigation and chill vigorous advocacy." The "satellite litigation" concern is no idle speculation. As one commentator observed in early 1988, in the less than five years which had then elapsed since Rule 11 was amended, there were in excess of 600 reported federal decisions and presumably many more unreported rulings addressing Rule *27 11 motions. See Schwarzer, Rule 11 Revisited, 101 Harv.L. Rev. 1013 (1988). Indeed, Judge Schwarzer noted that:
Controversy over the impact of the rule is growing. Its supporters argue that it has curbed litigation abuse, that its benefits outweigh whatever detriment it may cause, and that no alternative yet proposed can do the job. Its critics argue that it breeds wasteful litigation and chills vigorous, creative advocacy. The intensity of the ongoing debate warrants an examination of what we know about the rule and its effects, and consideration of how its enforcement can be channeled to better serve its purposes. [Ibid.]
We also point out that R. 4:42-9, precluding an award of counsel fees except in those limited circumstances expressly prescribed by rule or statute, represents a firm commitment in this jurisdiction to the principle that ordinarily litigants should bear their own counsel fees and a rejection of the so-called English rule of routinely assessing the winner's fees against the loser. The policy decision "that sound judicial administration is best advanced if litigants bear their own counsel fees" has been recently reaffirmed by the Supreme Court in Satellite Gateway Com. v. Musi Dining Car Co., 110 N.J. 280, 285, 540 A.2d 1267 (1988) (quoting State, Dept. of Envtl. Protect. v. Ventron Corp., 94 N.J. 473, 504, 468 A.2d 150 (1983)). See also Right to Choose v. Byrne, 91 N.J. 287, 316, 450 A.2d 925 (1982); Gerhardt v. Continental Ins. Cos., 48 N.J. 291, 301, 225 A.2d 328 (1966); Janovsky v. American Motorists Ins. Co., 11 N.J. 1, 7, 93 A.2d 1 (1952). The reasons in support of this policy are self-evident. It promotes the goal of equal access to the court irrespective of economic status. It protects against actual or apparent abuse and corruption. These are obviously critical concerns of our justice system. As Chief Justice Weintraub pointed out in Sunset Beach Amusement Corp. v. Belk, 33 N.J. 162, 167, 162 A.2d 834 (1960), prior to the great judicial reforms effected by the 1947 New Jersey Constitution, routine assessment of fees in favor of prevailing litigants had been the practice in the former Court of Chancery. With his customary clarity and economy of expression, Chief Justice Weintraub went on to explain that that practice had been wholly rejected in 1947 because "[i]n actual operation it proved unduly onerous *28 upon litigants and spawned charges of favoritism." Ibid. He also considered, and rejected on practicality grounds, the feasibility of allowing fees as a sanction for frivolous litigation. In a prescient view of the development of Rule 11 litigation, he said:
Although the sanction of counsel fees against a plaintiff who sues or a defendant who defends in manifest bad faith has much to commend it, yet the problem of confining allowances to precisely that situation would be a formidable one. [Ibid.]
We thus construe N.J.S.A. 2A:15-59.1 in view of the concern that while baseless litigation must be deterred, nevertheless the counsel-fee sanction mode of deterrence should not be permitted to generate even more litigation, the right of access to the courts should not be unduly infringed upon, honest and creative advocacy should not be discouraged, and the salutary policy of litigants bearing, in the main, their own litigation costs, should not be abandoned. Hence the counsel-fee sanction must not be made available for every litigation infraction.
We can foresee a variety of problems in interpreting the statute not unlike the panoply of issues encountered by the federal courts in applying Rule 11. Some are implicated here, such as defining prevailing party and determining whether a stipulation of dismissal with prejudice stands on the same footing as a unilateral notice of dismissal without prejudice. See Cooter & Gell v. Hartmarx Corp., supra. Nevertheless, we need not go beyond the narrow question of whether the litigation circumstances here met the penal threshold of the statute. We are convinced that they did not.
Rule 11 prescribes a conjunctive two-prong test for sanctionable baselessness: improper motive and a litigation position unfounded in fact and law. The test has been held by the federal courts to be objective. See, e.g. Zaldivar v. City of Los Angeles, 780 F.2d 823, 829 (9th Cir.1986), holding that:
The new text represents an intentional abandonment of the subjective focus of the Rule in favor of an objective one. The certificate now tests the knowledge *29 of the signing attorney by a `reasonableness' standard. The former requirement of willfulness has been deleted. `The [new] standard is one of reasonableness under the circumstances' (quoting Fed.R.Civ.P. 11 Advisory Committee Note).
We have no doubt that the similar, but disjunctive, two-prong test of the New Jersey statute must also be one of objective reasonableness.[2] First, we believe the statute itself so provides. Section (b) expressly requires the finding of frivolousness to be based on the record already made in the matter, thus precluding routine collateral evidential forays into states of mind and non-record facts and circumstances.[3] We regard this expression of legislative intention to be reinforced by the proviso of paragraph (c), which requires that counsel fee application be made "to the court which heard the matter," a stipulation we assume is meant to refer to the judge who has heard the matter and is therefore best equipped to evaluate the party's conduct on the basis of the record. Beyond the textual indications of an intended objective test, we are convinced that as a practical matter that test, rather than a subjective test, is far better calculated to reduce the length and complexity of the required hearing in support of a counsel fee motion made under the statute.
We are, moreover, persuaded that as measured by an objective standard on this record, plaintiffs' conduct here did not, as a matter of law, warrant imposition of the attorney-fee sanction either because of improper motives or lack of well-foundedness.[4] *30 To begin with, a critical element of this controversy, in our view, was the time factor. An election contest, if brought at all, must be brought within 30 days after the election. The opportunity for investigation, verification, and all of the other activity normally associated with a reasonable inquiry into the merits of a proposed action is significantly compressed and curtailed. The uncontroverted fact here, however, which was known prior to the institution of the action, was that over 170 voters known to support plaintiffs' political cause had been disqualified by irregular official procedures which the Attorney General later conceded were taken in violation of the election laws. We are of the view that that irregularity, of itself, justified the decision to seek to set the election aside. Two of the three plaintiffs were losing candidates immediately and personally affected by the regularity of the election. Two, including a winning candidate, were voters of the municipality having an objectively reasonable interest in vindicating the election laws.
It appears that the trial judge was not as concerned about the suit against the election boards as he was about the joinder of the three candidates, two winners and a loser. We disagree, however, with his apparent premise. First, we have no doubt that the incumbent, that is, the candidate whose *31 election is challenged, is a necessary party to an action seeking to nullify the election results. With respect to the losing candidate, Emberger, the record supports a reasonable basis for plaintiffs' belief that she was involved in bringing about the irregular disqualification of a large group of voters.
It also appears that the trial judge may have been particularly concerned about the scope of the action and its continued maintenance rather than its initial institution. We appreciate that continued prosecution of a claim or defense may, based on facts coming to be known to the party after the filing of the initial pleading, be sanctionable as baseless or frivolous even if the initial assertion of the claim or defense was not. We agree with Judge Bachman's perception in Chernin v. Mardon Corporation, 244 N.J. Super. 379, 582 A.2d 847 (Ch.Div. 1990), that requisite bad faith or knowledge of lack of well-groundedness may arise during the conduct of the litigation. But we also agree with his view that if the asserted legal position were not initially sanctionable, a party would be entitled to a reasonable opportunity to reappraise that position in response to facts and circumstances which later become known.
Here the entire action from beginning to end, but for its counsel-fee aspect, lasted five weeks. Within a month after its initiation, plaintiffs, by binding stipulation, agreed to abandon their damages claims. And significantly they did achieve vindication from the terms of the settlement agreement with the Attorney General. In view of these circumstances, we cannot conclude that there is an adequate basis in the record for finding plaintiffs' continued prosecution to have been legally unreasonable or maintained for an improper purpose.
Defendants make much of what they assert to have been an improper joinder of election contest issues with tort and civil rights causes attended by damages claims. We assume they are correct that a statutory election-contest petition pursuant to N.J.S.A. 19:29-1, because of the need for swift deposition, may not be joined with other claims. An improper *32 joinder alone does not, however, bespeak either improper motive or legal unfoundedness. We are moreover persuaded by the observation of the Ninth Circuit Court of Appeals in Romero v. City of Pomona, 883 F.2d 1418, 1429 (9th Cir.1989), an election-contest case, that sanctions
are appropriate `only when the pleading as a whole is frivolous or of a harassing nature, not when one of the allegations or arguments in the pleading may be so characterized' ... That some of the allegations made at the outset of litigation later proved to be unfounded does not render frivolous a complaint that also contains some non-frivolous claims.
See also Golden Eagle Distr. Corp. v. Burroughs Corp., 801 F.2d 1531, 1540-41 (9th Cir.1986).
Finally, we are concerned about imposing undue constraints on election-contest litigation. This is important litigation going to the heart of the democratic process upon which all our institutions depend. We recognize that such litigation is as subject to abuse as any other. But we are also convinced that because of the substantive nature of the issues involved in election contests and the time pressures involved in seeking judicial redress, the courts should be more, not less, indulgent in appraising the motives and well-groundedness of the litigants' legal positions.
The order allowing counsel fees is reversed.
NOTES
[1] It does not appear from the record that plaintiffs had a prior fair opportunity to state their asserted justification for prosecuting this action.
[2] We note but need not decide the issue raised by Zaldivar v. City of Los Angeles, supra at 832, of whether a pleading well grounded in fact and in law is ever subject to sanction because it is filed for an "improper purpose."
[3] Compare R. 4:46-6, adopted in 1983, which permits an award of counsel fees in favor of a prevailing party in an action tried to conclusion where that party's pretrial motion for summary judgment was defeated by a factual contention raised "in bad faith by the party opposing the motion with knowledge that it was a palpable sham or predicated on facts known or which should have been known by him to be false." The rule requires the determination of whether the conduct of the opposing party is sanctionable on the record in order to avoid the necessity for collateral hearings.
[4] Among the problems we note without deciding them are those suggested by the fact that while the thrust of the federal rule addresses the attorney's conduct in signing a frivolous pleading, for which, however, the client may also or exclusively be charged, our statute's focus, perhaps anomalously so, is on the client's conduct. Can a non-prevailing lay client who believes himself to be aggrieved ever know or be chargeable with knowledge "that the complaint, counterclaim, cross-claim or defense was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law?" Is the client who relies on his attorney's legal judgment and advice protected, as in the case of malicious prosecution and abuse of process claims, provided only that he accurately discloses the facts to his attorney? By the same token, is an attorney protected by accepting the client's statement of facts without, as required by the federal rule, conducting a further "reasonable inquiry" into them?