**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0749-18T3

CAROLYN CRAWFORD,

     Plaintiff-Respondent,

v.

EDWARD SGALIO and
MARGARET SGALIO,

     Defendants,

and

JEFFREY L. GOLD, ESQUIRE,

     Defendant/Third-Party
     Plaintiff-Appellant,

v.

JAY H. GREENBLATT, ESQUIRE,
and JONATHAN CRAWFORD,
jointly, severally, and in the alternative,

     Third-Party Defendants.

_____

Argued September 16, 2019 – Decided January 13, 2020

Before Judges Vernoia and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0205-17.

Richard Michael King, Jr., argued the cause for appellant.

Jay H. Greenblatt argued the cause for respondent (Greenblatt & Laube, PC, attorneys; Jay H. Greenblatt, on the brief).

PER CURIAM

Defendant Jeffrey L. Gold (Gold), an attorney licensed to practice in the State of New Jersey, appeals from an amended order awarding plaintiff Carolyn Crawford $19,613 in attorney's fees and costs based on a determination that Gold's counterclaim constituted a frivolous pleading under Rule 1:4-8. We affirm.

I.

We begin by recounting the long sequence of events that led the trial court to conclude Gold filed a frivolous counterclaim that justified an award of attorney's fees and costs. The original complaint in this matter asserted claims against defendant Edward Sgalio (Sgalio) and his wife, defendant Margaret

A-0749-18T3

Sgalio,[1] arising out of the purchase of real property in Sea Isle City. In November 2008, Sgalio entered in a contract to purchase the property in his own name from its owner Marjorie Roth.

Four months later, on March 28, 2009, Sgalio entered into a memorandum of understanding (MOU) with plaintiff concerning the purchase of the same property. Under the MOU, plaintiff and Sgalio agreed to form a limited liability company (LLC) that would purchase the Sea Isle City property for $210,000 from Roth. The MOU further provided plaintiff and defendant would open a bank account for the LLC, plaintiff would deposit $125,000 and Sgalio would contribute $40,000 to the account. Plaintiff and Sgalio also agreed that following the purchase of the property, plaintiff would obtain full ownership interest in the LLC by a stock transfer from Sgalio, for which he would be paid $39,000.

Three days after he and plaintiff signed the MOU, Sgalio purchased the property in his own name with the funds plaintiff deposited in the newly-created bank account. Plaintiff later became aware of Sgalio's purchase of the property,

---

[1] We refer to defendant Edward Sgalio as "Sgalio" for simplicity and clarity, and because he was directly involved with plaintiff and Gold in the transactions and other actions at issue on appeal. Where appropriate, we refer to defendant Margaret Sgalio by her full name.

A-0749-18T3

but he assured her that he did so to facilitate the purchase contemplated under the MOU, and that he would transfer the property to the LLC when it was formed.

Sgalio subsequently advised plaintiff there was a tidal-lands issue with the property that could pose significant problems with the plans to develop it. On November 17, 2009, plaintiff and Sgalio met with Gold, who undertook to represent them regarding the tidal-lands issue. At that time, Gold learned of plaintiff's interest in the property and understood the property had been purchased by Sgalio on plaintiff's behalf. According to Gold, at that meeting, he also discussed with plaintiff "the cause of action she might have against Sgalio," but plaintiff opted not to pursue any claims against Sgalio at that time. Gold and plaintiff also discussed potential claims against the title company, and he advised that title to the property be kept in Sgalio's name, even though plaintiff was the real party in interest, to prevent plaintiff from becoming a named party. Following the meeting, Gold accepted plaintiff's payment of his requested retainer and undertook prosecution of plaintiff's and Sgalio's tidal-lands claim against the title company that issued the title policy in connection with Sgalio's March 31, 2009 purchase of the property.

A-0749-18T3

On January 13, 2010, and again on March 15, 2010, plaintiff called Gold to inquire about what he was doing to pursue the title company claim. Gold never filed suit against the title company, and he never disclosed to plaintiff that he represented the Sgalios in other matters, or that in 2005 he represented other individuals who were under contract to purchase the same property from Roth and faced the same tidal-lands title issue.

By February 2010, Sgalio had defaulted on the mortgage he granted Roth to secure the loan she made for his purchase of the property. Gold contacted Sgalio and plaintiff to inform them that Sgalio "may stop payment on the [m]ortgage," and that they may involve Roth in any lawsuit related to the tidal-lands issue against the title company. In March 2010, Roth filed a foreclosure complaint against Sgalio. In July 2010, Gold notified Sgalio and plaintiff of the foreclosure complaint and advised them he hired an expert and planned to file an answer, counterclaim, and third-party claim against the title company. Plaintiff paid for the expert.

By November 2010, discovery requests in the foreclosure case caused Gold to advise plaintiff and Sgalio that he would likely have to disclose plaintiff's ownership interest in the property. Plaintiff subsequently retained Michael Ruberton, Esq. to protect her interest in the matter. Ruberton contacted

Gold, characterized Gold's actions as "unfathomable," and advised that all communication with plaintiff should be sent to him. In January 2011, Gold wrote to Sgalio and informed him plaintiff had obtained a new attorney and was "claiming all kinds of bad things" about him and them. In February 2011, Gold disclosed plaintiff's ownership interest in the property to opposing counsel in the foreclosure action.

In May 2011, Sgalio called Gold and told him to "drop [the] case." Gold then engaged in settlement negotiations with Sgalio's creditors and Roth, which resulted in a forbearance agreement in September 2011. The agreement required Sgalio to withdraw his defenses in the foreclosure action, allow it to proceed uncontested, and recommence his payments subject to a promissory note. In exchange, Roth agreed not to expose the property to a sheriff's sale for three years. In addition, Gold settled the third-party claim against the title company for $20,000. From the $20,000 settlement, Gold retained $14,874 to satisfy his outstanding bill for legal services, and Sgalio received the remaining balance.

Sgalio subsequently defaulted on his payments under the mortgage and forbearance agreement, and in February 2013, a complaint for foreclosure of a tax sale certificate was filed against the Sgalios. In July 2013, Gold successfully

6

negotiated a settlement on behalf of the Sgalios that prevented the plaintiff in that action from moving for foreclosure until November 1, 2013.

By the end of July 2013, the Sgalios found a buyer for the property. In September 2013, they met with Gold to "go over the [t]itle [w]ork," and on October 30, 2013, they closed title on their sale of the property. At closing, the Sgalios paid $82,000 to satisfy two of their creditors based on agreements Gold negotiated on their behalf in anticipation of the closing of title on the Sgalios' sale of the property. The property was sold to 5920 Sounds Avenue, LLC. Margaret Sgalio was the real estate agent in the sale and received a commission. Gold closed his file and billed the Sgalios.

Plaintiff received no compensation from the sale of the property, and alleged she first learned of the sale in April or May 2015 when her son discovered the sale while looking up tax information. Plaintiff retained Jay H. Greenblatt, Esq., to inquire about the sale. In November 2015, Greenblatt contacted Gold about reviewing his file related to the sale of the property. Gold and Greenblatt exchanged correspondence over the next four months related to Greenblatt's efforts to review Gold's file. Gold sent Greenblatt incomplete files and resisted Greenblatt's repeated requests to view his entire file related to the property.

In April 2016, plaintiff filed her complaint against the Sgalios, 5920 Sounds Avenue, LLC, and fictitious defendants, claiming they conspired to, and did, defraud plaintiff. Greenblatt did not serve Gold with the complaint because he believed Gold had a conflict of interest because of his representation of plaintiff in connection with the claims made in the foreclosure litigation with Roth and the tidal-lands issue with the title company. Gold filed an answer on behalf of the Sgalios in response to the complaint. Greenblatt and Gold continued to communicate concerning Greenblatt's request to review Gold's complete file related to the property, and Gold continued to refuse to supply the complete file.

In a September 23, 2016 order, the court granted plaintiff's motion to disqualify Gold from representing the Sgalios. The court determined Gold had "a conflict representing [the Sgalios] in a case filed by his former client [plaintiff]." The court explained that plaintiff's complaint "involves substantially the same issues, it involves the same property, and even more significantly it involves the contractual relationship between both of [Gold's] former clients." The court concluded that Gold's representation of the Sgalios "in a case filed by his former client [plaintiff], represents a conflict and is inconsistent with the ethical principles of Rules 1.7 and 1.9 of the New Jersey

8

Rules of Professional Conduct and with the standards set by the New Jersey Supreme Court."

Greenblatt continued his efforts to obtain access to Gold's file related to the property. In response to plaintiff's second motion to compel production of the file, the court entered an October 21, 2016 order directing that Gold provide plaintiff access to his "full and complete files relative to his prior representation of [plaintiff] regarding the mortgage foreclosure, tax sale certificate foreclosure and title company action concerning" the property for review by plaintiff's counsel, and awarding plaintiff attorney's fees. On November 28, 2016, the court ordered Gold to pay plaintiff $4,500 in attorney's fees and again ordered him to provide plaintiff unfettered access to the files. Finally, on January 12, 2017, the court ordered Gold to bring the "full and complete files" to an in-person case management conference scheduled for February 7, 2017.

Greenblatt viewed Gold's files prior to the February 7 conference, and on February 6, 2017, he sent Gold a letter asserting that, despite owing plaintiff a duty as his client, Gold "served only the interest of the Sgalios" when he helped them sell the property with knowledge that his prior client, plaintiff, held a legal interest in the property. Greenblatt further asserted Gold's numerous representations that he had nothing to do with the October 30, 2013 property

sale were contrary to information contained in Gold's file, and he alleged Gold committed "at the least, malpractice and at the most, fraud," for facilitating the sale of the property while knowing plaintiff was the "equitable owner and real party in interest."[2] Greenblatt advised Gold to contact his malpractice insurer, and he expressed his wish to "resolve the matter amicably."

By letter dated February 13, 2017, Gold threatened that if Greenblatt "attempt[ed] to add [Gold] to the case based upon the allegations in [Greenblatt's] letter," he would file a counterclaim against plaintiff, a third-party complaint against plaintiff's son, and a third-party complaint against Greenblatt for "facetious allegations." Gold pointed out the filing of those claims would require the retention of separate counsel by each of the parties.

Plaintiff filed an amended complaint naming Gold as a defendant and alleging he breached his fiduciary duty to plaintiff by allowing the Sgalios to

---

[2] For example, in a December 1, 2010 letter from Gold to plaintiff and Sgalio, Gold stated it was his "understanding . . . the property had been bought in [Sgalio's] name for [plaintiff] and that was why" plaintiff "paid" Gold's "[r]etainer." In a January 2011 letter, Gold advised that when he first met with plaintiff on November 17, 2009, he discussed with her "the conflict possibility and the cause of action she might have against Sgalio." In a June 27, 2017 certification, Gold explained that at his first meeting with plaintiff on November 17, 2009, they discussed that "[t]itle on the property was in Sgalio's name although it was to be in [plaintiff's] name," but plaintiff "did not at [that] time want to change that since she did not want to be involved as a named [d]efendant in the [then-pending] [f]oreclosure lawsuit."

A-0749-18T3

violate her rights related to the property, committed legal malpractice, and conspired to defraud plaintiff. In response, Gold filed a counterclaim against plaintiff and a third-party complaint against plaintiff's son and Greenblatt. In his counter-claim, Gold alleged: (1) plaintiff "negligently failed to make the appropriate investigation before filing" her amended complaint; (2) plaintiff "aided and abetted her son . . . and [Greenblatt] in filing an improper cause of action"; (3) plaintiff, her son, and Greenblatt "conspired to cause damage to [Gold] without proper cause and proper investigation"; (4) plaintiff asserted her claims against Gold in bad faith; and (5) plaintiff's claims against Gold were defamatory. In his third-party complaint, Gold alleged similar causes of action against plaintiff's son and Greenblatt.

On May 22, 2017, Greenblatt sent Gold a letter pursuant to Rule 1:4-8, demanding Gold voluntarily withdraw his counterclaim and third-party complaints. Greenblatt asserted the pleadings violated Rule 1:4-8(a)(1) – (3) because they asserted claims "for an improper purpose," were "unwarranted under existing law," and "clearly have insufficient evidentiary support." Greenblatt further stated Gold's claims were "without any legal or factual basis." Greenblatt warned Gold that if the counterclaim and third-party complaint were

not dismissed within twenty-eight days, he would apply to the court for sanctions.

Two weeks later, Greenblatt, on plaintiff's behalf and on his own behalf as a pro se defendant in the third-party complaint, moved to dismiss Gold's counterclaim and third-party complaint. Although captioned as a summary judgment motion and supported by Greenblatt's certification attaching two letters from Gold, the motion requested dismissal of the counterclaim and third-party complaint "on the grounds that they fail to state claims upon which relief may be granted."

On July 14, 2017, the court granted the motion in part. The court interpreted Gold's pleadings to assert claims for common law negligence and professional malpractice, malicious abuse of process, civil conspiracy, intentional tort liability under § 870 of Restatement (Second) of Torts (1979), aiding and abetting, and defamation. The court dismissed the allegations in the pleadings for negligence and professional malpractice, malicious abuse of process, and defamation because they failed to state claims upon which relief could be granted as a matter of law. The court denied without prejudice the request to dismiss the remaining claims, finding "the merits of [these] claim[s] [had] not been substantially adjudicated."

A-0749-18T3

Plaintiff and Greenblatt filed a motion for reconsideration and for a more definite statement as to the remaining claims. On September 11, 2017, the court denied the motion for reconsideration, but granted the motion for a more definite statement and ordered Gold to provide "a certified pleading setting forth more specific allegations and more specific causes of action that shall serve to supplement and become a part of the [c]ounterclaim and [t]hird-[p]arty [c]laim." In its written decision, the court noted the allegations in Gold's counterclaim and third-party complaints were "not reasonably certain enough to place [m]ovants on notice of the claims against them," and the "[m]ovants strain[ed] to categorize the causes of action against them in the within motion and the previous motion to dismiss."

Plaintiff's claims against the Sgalios were settled in mediation, but plaintiff's claims against Gold and those he asserted in counterclaim and third-party complaint remained outstanding. Gold never complied with the court's September 11, 2017 order requiring that he file a more definite statement of the causes of action in those pleadings. Instead, he filed a motion for voluntary dismissal of the counterclaim and third-party complaint. Greenblatt opposed the motion and moved to involuntarily dismiss Gold's counterclaim and third-party complaints. The court granted the motion for involuntary dismissal.

A-0749-18T3

Greenblatt subsequently moved for sanctions and attorney's fees pursuant to Rule 1:4-8. In support of the motion, Greenblatt supplied a certification of his services. Gold opposed the motion, and the court heard oral argument.

In a detailed written April 18, 2018 decision, the court granted the motion for sanctions and attorney's fees explaining it had allowed Gold to provide a more definite statement as to the causes of action asserted in the counterclaim and third-party complaint, but Gold "never actually filed a more specific statement." The court noted that, instead, Gold relied on his claim the causes of action in the amended complaint lacked merit because he was not involved in the Sgalio's October 30, 2013 sale of the property. The court found the argument unpersuasive and that "[a]t best, [it] perhaps . . . suggest[s] a defense to [p]laintiff's claims, but it ignores his wholly unsupported counterclaims and third[-]party complaint."

The court concluded that "[b]ased on [Gold's] refusal to release his client's file multiple times, as well as [Gold's] previous failure to comply with a [c]ourt [o]rder to provide more support for his counterclaims and third[-]party complaint . . . [Gold's] counterclaim and third[-]party complaint were frivolous." In granting the motion, the court required that Greenblatt supply a supplemental

certification of services supporting his attorney's fees claim. Gold filed a motion for reconsideration, which the court denied.

On August 28, 2018, after a "thorough review" of Greenblatt's application, the court ordered Gold to pay $13,877 in attorney's fees. The court found Greenblatt's billable rate reasonable when compared to fees charged by other attorneys "who possess similar qualifications." Greenblatt subsequently notified the court that the amount it awarded was based on his original certification submitted in support of the motion, and that the court did not consider the supplemental certification which described additional services rendered in response to Gold's reconsideration motion. The court filed an amended September 26, 2018 order, requiring that Gold pay $19,613 in attorney's fees. This appeal followed.

Gold presents the following arguments for our consideration:

> POINT I
>
> AS A PREREQUISITE TO AN AWARD OF FEES, RULE 1:4-8 REQUIRES THE "SAFE HARBOR" LETTER SET FORTH THE BASIS FOR THE ALLEGATION OF FRIVOLOUSNESS "WITH SPECIFICITY", AND THE APPLICANT IN THIS CASE ENTIRELY FAILED TO DO SO[.]
>
> POINT II

15

IT WAS AN ABUSE OF DISCRETION AND A VIOLATION OF THE SPIRIT OF THE "SAFE HARBOR" PROVISION TO AWARD NEARLY $20,000 OF ATTORNEY'S FEES FOR A COUNTERCLAIM THAT SURVIVED SUMMARY JUDGMENT AND WAS DISMISSED ALMOST IMMEDIATELY AFTER THE UNDERLYING CLAIM WAS RESOLVED IN MEDIATION[.]

POINT III

THE COURT IMPROPERLY REACHED CONCLUSIONS OF FACT ON DISPUTED ISSUES OF FACT REGARDING THE CREDIBILITY OF GOLD'S FACTUAL POSITION WITHOUT CONDUCTING AN EVIDENTIARY HEARING[.]

POINT IV

GREENBLATT CONCEDED CRAWFORD'S AFFIRMATIVE CLAIM WAS "INEXTRICABLY INTERTWINED" WITH HER PURSUIT OF THE UNDERLYING CLAIM AGAINST SGALIO AND GOLD, AND IT IS NOT FAIR OR REASONABLE TO CONCLUDE $20,000 WAS SPENT DEFENDING THE COUNTERCLAIM AS OPPOSED TO PROSECUTING THE SETTLED CASE IN CHIEF[.]

II.

We review a court's award of attorney's fees under Rule 1:4-8 for an abuse of discretion. Bove v. AkPharma, Inc., 460 N.J. Super. 123, 146 (App. Div. 2019) (citing McDaniel v. Man Wai Lee, 419 N.J. Super. 482, 498 (App. Div. 2011)). Reversal is warranted "only if [the decision] 'was not premised upon

16

consideration of all relevant factors, was based upon consideration of irrelevant or inappropriate factors, or amounts to a clear error in judgment.'" McDaniel, 419 N.J. Super. at 498 (quoting Masone v. Levine, 382 N.J. Super. 181, 193 (App. Div. 2005)). To the extent the court's decision implicates legal principles, we independently evaluate those legal assessments de novo. Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995); Finderne Mgmt. Co., Inc. v. Barrett, 402 N.J. Super. 546, 573 (App. Div. 2008).

Rule 1:4-8 allows an attorney or pro se litigant "to be sanctioned for asserting frivolous claims on behalf of a client." United Hearts, LLC v. Zahabian, 407 N.J. Super. 379, 389 (App. Div. 2009). Rule 1:4-8(a) provides that when an attorney or pro se party signs, files, or advocates "a pleading, written motion, or other paper," that attorney or pro se party "certifies that to the best of his or her knowledge, information, and belief":

> (1) the paper is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the factual allegations have evidentiary support or, as to specifically identified allegations, they are either

likely to have evidentiary support or they will be withdrawn or corrected if reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support; and

(4) the denials of factual allegations are warranted on the evidence or, as to specifically identified denials, they are reasonably based on a lack of information or belief or they will be withdrawn or corrected if a reasonable opportunity for further investigation or discovery indicates insufficient evidentiary support.

[R. 1:4-8(a)].

Under Rule 1:4-8(b)(1), "[a] court may impose sanctions upon an attorney if the attorney files a paper that does not conform to the requirements of Rule 1:4-8(a), and fails to withdraw the paper within twenty-eight days of service of a demand for its withdrawal." Zahabian, 407 N.J. Super. at 389.

"For purposes of imposing sanctions under Rule 1:4-8, an assertion is deemed 'frivolous' when 'no rational argument can be advanced in its support, or it is not supported by any credible evidence, or it is completely untenable.'" Ibid. (quoting First Atl. Fed. Credit Union v. Perez, 391 N.J. Super. 419, 432 (App. Div. 2007)). "Sanctions are warranted 'only when the pleading as a whole is frivolous or of a harassing nature," id. at 390 (quoting Iannone v. McHale, 245 N.J. Super. 17, 32 (App. Div. 1990)), and just because "some of the allegations made at the outset of litigation later proved to be unfounded does not

render frivolous a complaint that also contains some non-frivolous claims," Iannone, 245 N.J. Super. at 32 (quoting Romero v. City of Pomona, 883 F.2d 1418, 1429 (9th Cir. 1989)). However, "continued prosecution of a claim or defense may, based on facts coming to be known to the party after the filing of the initial pleading, be sanctionable as baseless or frivolous even if the initial assertion of the claim or defense was not." Id. at 31.

Gold contends the motion court abused its discretion by finding his counterclaim and third-party complaint constituted frivolous pleadings because the court partially denied plaintiff's and Greenblatt's motion for summary judgment and allowed the continued prosecution of some of Gold's claims. Relying on our decision in Zahabian, Gold contends "one cannot be deemed to have litigated the matter in bad faith after [the] [t]rial court permitted [the] matter to proceed through summary judgment." Gold claims the court's partial denial of the summary judgment motion requires the conclusion his surviving claims were not frivolous, and therefore the court's award of attorney's fees "essentially . . . punished [Gold] for withdrawing . . . non-frivolous claim[s]."

We reject Gold's argument for two reasons. First, his reliance on Zahabian is misplaced. In that case, we held "a pleading cannot be deemed frivolous as a whole . . . where . . . the trial court denies summary judgment on at least one

count in the complaint <u>and allows the matter to proceed to trial</u>." <u>Zahabian</u>, 407 N.J. Super. at 394 (emphasis added). Here, Gold's claims never proceeded to trial because they were involuntary dismissed.

Second, the motion court's decision and order denying plaintiff's and Greenblatt's summary judgment motion were not based on a finding the surviving claims were meritorious. To the contrary, the court determined only that the claims were not sufficiently pleaded to assert causes of action upon which relief could be granted. After providing Gold an opportunity to recast his pleadings, the court properly concluded the surviving claims were frivolous because they were unsupported by "rational argument" or "any credible evidence." <u>Id</u>. at 389.

Further, the evidence showed the claims were asserted in a bad-faith effort to create leverage against plaintiff, her son, and Greenblatt. As noted, Greenblatt informed Gold that plaintiff intended to file claims against him for breaching his ethical duty to her by aiding the Sgalios' October 30, 2013 sale of the property while knowing that his former client, plaintiff, held an interest in the property. In response, Gold not only threatened to file what became his unsupported and unsupportable claims against plaintiff, her son, and Greenblatt, he made clear that his retaliatory filing of those claims would cause plaintiff and

the others to separately incur attorney's fees.  In other words, Gold threatened plaintiff and the others that they would be compelled to incur attorney's fees defending his frivolous claims.  As the motion court correctly determined, such circumstances support an award of fees under Rule 1:4-8.

Gold also argues Greenblatt's Rule 1:4-8 letter requesting the withdrawal of the frivolous pleadings was inadequate because it did not state with sufficient specificity the basis for the request, and, as a result, Gold did not receive notice of which parts of the pleadings were claimed to be frivolous.  We reject the argument because it was not raised before the motion court and does not go to our jurisdiction or involve a matter of public concern.  Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973).  Moreover, the argument lacks sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), other than to note Greenblatt's letter expressly requested withdrawal of the counterclaim and third-party complaint because they asserted claims lacking "any legal or factual basis."  We are convinced the letter satisfied the requirements of Rule 1:4-8 because it was "sufficiently specific and detailed to provide an opportunity to 'withdraw the assertedly offending pleadings.'"  Ferolito v. Park Hill Ass'n, 408 N.J. Super. 401, 408 (App. Div. 2009) (quoting Trocki Plastic Surgery Ctr. v. Bartkowski, 344 N.J. Super. 399, 406 (App. Div. 2001)).

A-0749-18T3

Gold also argues the court erred by making credibility determinations in its disposition of his reconsideration motion. More particularly, Gold points to the following statement in the court's decision denying the motion: "Gold again attempts to rehash whether he was involved in the 'out sale' contract" [for the Sgalio's October 30, 2013 sale of the property]. The [c]ourt did not find his arguments to be credible." Gold claims the statement shows the court's decision was improperly founded on a credibility determination, and that there is a factual issue as to whether he participated in the sale. We are not persuaded.

Gold misinterprets the court's statement and takes it out of context. Gold opposed plaintiff's motion for sanctions under Rule 1:4-8 by arguing he was not involved in the Sgalio's sale of the property and, as such, he could not be found liable for any of plaintiff's asserted claims against him. At oral argument, the court observed that Gold's position might support a defense to plaintiff's claims, but it did not provide factual or legal support for the claims he asserted in the counterclaim and third-party complaint. The court made the same point in its written decision. Thus, when the court characterized Gold's argument as not "credible," it merely noted the argument was not relevant to the issue presented by the reconsideration motion—whether the court's order awarding sanctions under Rule 1:4-8 was based upon a palpably incorrect or irrational basis or was

entered by the court without consideration of, or a failure to appreciate, the significance of probative, competent evidence.  See Palombi v. Palombi, 414 N.J. Super. 274, 288 (App. Div. 2010); D'Atria v. D'Atria, 242 N.J. Super. 392, 401 (Ch. Div. 1990)).

Gold also argues the fees awarded by the court were unreasonable.  Gold asserts the court "simply accepted" Greenblatt's certification of services provided, "without any analysis of the factors required for the granting of attorney's fees."  Additionally, Gold challenges the increase in awarded fees from $13,877 to $19,613.

A party applying for an award of attorney's fees pursuant to Rule 1:4-8 is not necessarily "entitled to recover . . . all [its] fees and costs"; "only reasonable attorney fees may be awarded" under Rule 1:4-8.  DeBrango v. Summit Bancorp, 328 N.J. Super. 219, 229 (App. Div. 2000).  As such, courts should not passively accept "the submissions of counsel," but should instead "evaluate carefully and critically the aggregate hours and specific hourly rates advanced by counsel for the prevailing party to support the fee application."  Walker v. Giuffre, 209 N.J. 124, 131 (2012) (quoting Rendine v. Pantzer, 141 N.J. 292, 335 (1995)).  Indeed, "[i]n fashioning an attorney fee award, the judge must determine the 'lodestar,' which equals the number of hours reasonably expended multiplied by a

reasonable hourly rate." J.E.V. v. K.V., 426 N.J. Super. 475, 493 (App. Div. 2012).

Here, the court conducted the required analysis of the fee request. It determined Greenblatt's hourly rate of $385 per hour was reasonable by comparing it to the rates of other attorneys who possess similar qualifications. The court then multiplied that rate by 50.1 hours, which was the amount of time Greenblatt certified he spent working on the counterclaim and third-party complaints since May 2017, and which the court deemed reasonable. The court also did not arbitrarily adjust the fee award from $13,877 to $19,613. Rather, the court merely corrected the fee award when it learned it failed to consider Greenblatt's supplemental certification of services provided. Gold offers no basis grounded in the applicable law or evidence to reverse the court's award, and we find none in our independent review of the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0749-18T3